SCHWEIKER, SECRETARY OF HEALTH AND
HUMAN SERVICES *v.* HOGAN ET AL.

No. 81–213.   Argued March 24, 1982—Decided June 21, 1982

STEVENS, J., delivered the opinion for a unanimous Court.

*George W. Jones* argued the cause *pro hac vice* for appellant. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller, William Kanter, Bruce G. Forrest, Lynne K. Zusman,* and *Robert P. Jaye.*

*William H. Simon,* by appointment of the Court, 454 U. S. 1051, argued the cause for appellees. With him on the brief were *Mark Coven, Gill Deford,* and *Gary Bellow.**

---

*\*Francis X. Bellotti,* Attorney General of Massachusetts, and *Mitchell J. Sikora, Jr.,* and *Paul W. Johnson,* Assistant Attorneys General, filed a brief for the Commonwealth of Massachusetts as *amicus curiae* urging reversal.

*Bruce K. Miller* and *Dennis Caraher* filed a brief for the Massachusetts Association of Older Americans as *amicus curiae* urging affirmance.

JUSTICE STEVENS delivered the opinion of the Court.

At issue in this case are the meaning and validity of § 1903(f) of the Social Security Act, 81 Stat. 898, as amended, 42 U. S. C. § 1396b(f). As applied in Massachusetts, that provision results in a distribution of Medicaid benefits to recipients of Supplemental Security Income (SSI)—a class of aged, blind, or disabled persons who lack sufficient income to meet their basic needs—that is more generous than the distribution of such benefits to persons who are self-supporting. Appellees are members of the latter class. Because they must incur medical expenses—for which they are never reimbursed—before they become eligible for Medicaid, they have less income available for their nonmedical needs than the recipients of SSI. The District Court concluded that this discrimination was irrational and held that § 1903(f) was unconstitutional. *Hogan* v. *Harris*, 501 F. Supp. 1129 (Mass. 1980). We disagree and reverse.

The statutory provisions governing the Medicaid program are complex. See 42 U. S. C. § 1396 *et seq.* (1976 ed. and Supp. IV). We first consider the history of the specific provisions at issue in this case, then relate the circumstances that gave rise to the present controversy, and finally address the two legal issues that are presented.

I

Section 1903(f) of the Social Security Act (Act) was enacted in 1968. To understand the present controversy, however, it is necessary to consider amendments to the Act made in 1965, 1967, and 1972.

A

The Medicaid program was established in 1965 in Title XIX of the Act "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris* v. *McRae*, 448 U. S. 297, 301. Section 1902(a)(10) of the Act, 42

U. S. C. § 1396a(a)(10), sets forth the basic scope of the program, which has not changed significantly from its enactment in 1965. See 79 Stat. 345. Participating States are required to provide Medicaid coverage to certain individuals—now described as the "categorically needy"; at their option States also may provide coverage (and receive partial federal reimbursement) to other individuals—described as the "medically needy." See *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 37.[1] These classes are defined by reference to other federal assistance programs.

In 1965, federal assistance programs existed for the aged, the blind, the disabled, and families with dependent children.[2] At that time, each of these programs was administered by the States, which established both the "standard of need" and the "level of benefits." See *Jefferson* v. *Hackney*, 406 U. S. 535; *Rosado* v. *Wyman*, 397 U. S. 397.[3] In establishing the Medicaid program, Congress required participating States to provide medical assistance to individuals who received cash payments under one of these assistance programs. 79 Stat. 345, as amended, 42 U. S. C. § 1396a(a) (10)(A). The House Report explained: "These people are the most needy in the country and it is appropriate for

---

[1] But see n. 18, *infra*.

[2] These programs were entitled: Old Age Assistance (OAA), 42 U. S. C. § 301 *et seq.* (1970 ed.); Aid to the Blind, § 1201 *et seq.;* Aid to the Permanently and Totally Disabled, § 1351 *et seq.;* and Aid to Families with Dependent Children (AFDC), § 601 *et seq.* See also 42 U. S. C. §§ 1381–1385 (1970 ed.). These programs are of course fundamentally different from Old Age, Survivors, and Disability Insurance (OASDI or Social Security), 42 U. S. C. § 401 *et seq.*

[3] In many States, the "level of benefits" did not raise an individual's income to the "standard of need." The standard of need determined eligibility for *some* benefits; often the benefits provided, however, were merely a fraction of the difference between the individual's income and the defined standard of need. See *Jefferson* v. *Hackney*. The standards of need also typically varied from program to program.

medical care costs to be met, first, for these people."[4] They are the "categorically needy."

Congress also provided that a participating State could offer Medicaid benefits to individuals who fell within one of the categories for which federal assistance was available but whose income made them ineligible for aid under those programs. These individuals were deemed "less needy"[5] and could receive assistance only if their income and resources were insufficient "to meet the costs of necessary medical or remedial care and services." 79 Stat. 345, as amended, 42 U. S. C. § 1396a(a)(10)(C). In 1965, no limit was placed on the extent to which federal reimbursement was available for optional coverage that States elected to provide to these persons who might become "medically needy."[6]

---

[4] H. R. Rep. No. 213, 89th Cong., 1st Sess., 66 (1965) (1965 House Report).

[5] Ibid. See also S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 77 (1965) (1965 Senate Report).

[6] The 1965 Act contained certain requirements governing the comparative treatment of different beneficiaries under the Act. It provided that the medical assistance afforded to an individual who qualified under any categorical assistance program could not be different from that afforded to an individual who qualified under any other program. 79 Stat. 345, as amended, 42 U. S. C. § 1396a(a)(10)(B)(i). In other words, the amount, duration, and scope of medical assistance provided to an individual who qualified to receive assistance for the aged could not be different from the amount, duration, and scope of benefits provided to an individual who qualified to receive assistance for the blind. "This will assure comparable treatment for all of the needy under the federally aided categories of assistance and will eliminate some of the unevenness which has been apparent in the treatment of the medical needs of various groups of the needy." 1965 House Report, at 66. See also 1965 Senate Report, at 77.

A similar "comparability" requirement among the aged, blind, disabled, and dependent applied to the optional distribution of benefits to the "medically needy." If a State elected to provide benefits to one group, it was obligated to provide benefits to the others, and "the determination of financial eligibility must be on a basis that is comparable as among the people who, except for their income and resources, would be recipients of money

Since States established the income limits for the categorical assistance programs, they also established the income limits for the "categorically needy" under the Medicaid program. In addition, participating States established the eligibility standards for the optional coverage provided to the "medically needy." In § 1902(a)(17) of the Act, 42 U. S. C. § 1396a (a)(17), however, Congress set forth certain requirements governing state standards for determining eligibility. In particular, Congress required States to "provide for flexibility in the application of such standards with respect to income by taking into account, except to the extent prescribed by the Secretary, the costs (whether in the form of insurance premiums or otherwise) incurred for medical care or any other type of remedial care recognized under State law." 79 Stat. 346; see 42 U. S. C. § 1396a(a)(17).[7]

---

for maintenance under the other public assistance programs." 1965 House Report, at 67; see also 1965 Senate Report, at 77. 79 Stat. 345, as amended, 42 U. S. C. § 1396a(a)(10)(C)(i). In addition, the benefits provided to each categorical group of the medically needy were required to be equal in amount, duration, and scope. 79 Stat. 345, as amended, 42 U. S. C. § 1396a(a)(10)(C)(ii).

In its provision for "comparability among the various categorical groups of needy people," 1965 House Report, at 67, the Act required comparability in the criteria used to determine eligibility for each group. 79 Stat. 346, as amended, 42 U. S. C. § 1396a(a)(17). See also 1965 House Report, at 67; 1965 Senate Report, at 77 ("Although States may set a limitation on income and resources which individuals may hold and be eligible for aid, they must do so by maintaining a comparability among the various categorical groups of needy people"). Finally, the Act provided that the assistance provided to the "medically needy" could not be greater in amount, duration, or scope than the assistance provided to the "categorically needy." 79 Stat. 345, as amended, 42 U. S. C. § 1396a(a)(10)(B)(ii). "This was included in order to make sure that the most needy in a State receive no less comprehensive care than those who are not as needy." 1965 House Report, at 67; see also 1965 Senate Report, at 77.

[7] In its discussion of this portion of the statute, the 1965 House Report, at 68, explains:

"The bill also contains a provision designed to correct one of the weaknesses identified in the medical assistance for the aged program. Under

Most States promptly elected to participate in the Medicaid program.[8] Many of these States also chose to provide Medicaid coverage to the "medically needy." Within a year, Congress recognized that it was fiscally improvident to rely exclusively on the States to set income limits for both aspects

the current provisions of Federal law, some States have enacted programs which contain a cutoff point on income which determines the financial eligibility of the individual. Thus, an individual with an income just under the specified limit may qualify for all of the aid provided under the State plan. Individuals, however, whose income exceeds the limitation adopted by the State are found ineligible for the medical assistance provided under the State plan even though the excess of the individual's income may be small when compared with the cost of the medical care needed. In order that all States shall be flexible in the consideration of an individual's income, your committee bill requires that the States standards for determining eligibility for and the extent of medical assistance shall take into account, except to the extent prescribed by the Secretary, the cost—whether in the form of insurance premiums or otherwise—incurred for medical care or any other type of remedial care recognized under State law. Thus, before an individual is found ineligible for all or part of the cost of his medical needs, the State must be sure that the income of the individual has been measured in terms of both the State's allowance for basic maintenance needs and the cost of the medical care he requires."

See also 1965 Senate Report, at 78–79. To this extent, the House Report mirrors the statutory language. In further describing this provision, however, the 1965 House Report, at 68, immediately continues:

"The State may require the use of all the excess income of the individual toward his medical expenses, or some proportion of that amount. In no event, however, with respect to either this provision or that described below with reference to the use of deductibles for certain items of medical service, may a State require the use of income or resources which would bring the individual below the test of eligibility under the State plan. If the test of eligibility should be $2,000 a year, an individual with income in excess of that amount shall not be required to use his income to the extent he has remaining less than $2,000. This action would reduce the individual below the level determined by the State as necessary for his maintenance."

See also 1965 Senate Report, at 79. This additional comment has no direct foundation in the statutory language of § 1902(a)(17). See 42 U. S. C. § 1396a(a)(17).

[8] See H. R. Rep. No. 544, 90th Cong., 1st Sess., 117 (1967) (1967 House Report).

of the Medicaid program.   See H. R. Rep. No. 2224, 89th Cong., 2d Sess., 1–3 (1966).   It cautioned States "to avoid unrealistic levels of income and resources for title XIX eligibility purposes."   *Id.*, at 3.

## B

In 1967, Congress placed a limit on federal participation in the Medicaid program.   Representative Mills introduced a bill, sponsored by the Johnson administration, that would have made significant changes in both the Medicaid program and the categorical assistance programs.   H. R. 5710, 90th Cong., 1st Sess. (1967).   Under § 220 of H. R. 5710, a State participating in the Medicaid program would have been entitled to receive federal financial assistance for providing Medicaid benefits only to those persons whose income, after deduction of incurred medical expenses, was less than 150% of the highest of the State's categorical assistance standards of need.[9]   Section 202 of the bill would have required States to revise annually the standards of need under each of the categorical assistance programs to reflect changes in the costs of living and, in some circumstances, to pay 100% of the standard of need established under the programs.   In support of this provision, the Secretary of the Department of Health, Education, and Welfare explained that "33 States provide less support for needy children [under the AFDC program] than the standards the States themselves have set as necessary to meet basic human needs."[10]

---

[9] This provision, of course, would have had no effect on the "categorically needy," since their income was necessarily less than 150% of the highest categorical assistance standard of need.

[10] President's Proposals for Revision in the Social Security System: Hearings on H. R. 5710 before the House Committee on Ways and Means, 90th Cong., 1st Sess., 118 (1967).   In January 1965, there were 21 States that paid less than 75% of the standard of need established for a family of four under the State's AFDC program.   *Id.*, at 119.

After extensive consideration, the House Ways and Means Committee reported out a substantially revised bill. H. R. 12080, 90th Cong., 1st Sess. (1967). The Committee Report described its primary proposed limitation on federal participation:

> "Your committee is proposing . . . that Federal sharing will not be available for families whose income exceeds 133⅓ percent of the highest amount ordinarily paid to a family of the same size (without any income and resources) in the form of money payments under the AFDC program. (AFDC income limits are, generally speaking, the lowest that are used in the categorical assistance programs)." 1967 House Report, at 119.

As noted, see n. 10, *supra*, the amount of benefits *paid* in many States was less than the qualifying standard of need.[11] The Committee Report explained the reasons for the move to limit federal participation in the Medicaid program. After noting that a few States had provided benefits beyond that anticipated by Congress, it stated:

> "Your committee expected that the State plans submitted under title XIX would afford better medical care and services to persons unable to pay for adequate care.

---

[11] The proposed bill also provided another limit on federal participation. It included a provision that set "a figure of 133⅓ percent of the average per capita income of a State as the upper limit on Federal sharing when applied to a family of four under the title XIX program." 1967 House Report, at 119. It is noteworthy that these proposals were not an insignificant part of what was—admittedly—a complex bill. In setting forth at the outset the "principal purposes of the bill," the House Report provides:

"Fifth, to modify the program of medical assistance to establish certain limits on Federal participation in the program and to add flexibility in administration, the bill would—

"(*a*) Impose a limitation on Federal matching at an income level related to payments for families receiving aid to families with dependent children or to the per capita income of the State, if lower." *Id.*, at 5.

It neither expected nor intended that such care would supplant health insurance presently carried or presently provided under collective bargaining agreements for individuals and families in or close to an average income range. Your committee is also concerned that the operation of some State plans may greatly reduce the incentives for persons aged 65 or over to participate in the supplementary medical insurance program [Medicare] of title XVIII of the Social Security Act, which was also established by the Social Security Amendments of 1965. The provisions of the bill are directed toward eliminating, insofar as Federal sharing is concerned, these clearly unintended and, in your committee's judgment, undesirable actual and potential effects of the legislation." *Id.*, at 118.

In States that paid less than 75% of the AFDC standard of need, the House provision would have provided Medicaid benefits only to persons whose income, after deduction of incurred medical expenses, was less than the AFDC standard of need.[12]

The Committee proposal was severely criticized on the House floor.[13] It nevertheless was passed by the House and

---

[12] If the House bill applied to both the categorically needy and the medically needy, it could have resulted in the denial of Medicaid benefits to certain categorically needy individuals who—although eligible for assistance under the State's standard of need—had an income that was higher than 133⅓% of the amount the State actually *paid* to a qualifying individual with no income. The House bill did not, however, alter § 1902(a)(10) of the Act, 42 U. S. C. § 1396a(a)(10), which required participating States to provide Medicaid benefits to all of the categorically needy.

[13] See 113 Cong. Rec. 23065 (1967) (remarks of Rep. King); *id.*, at 23077 (remarks of Rep. Burke); *id.*, at 23082 (remarks of Rep. Vanik); *id.*, at 23084 (remarks of Rep. Bingham); *id.*, at 23087 (remarks of Rep. Halpern); *id.*, at 23093 (remarks of Rep. Ryan); *id.*, at 23104 (remarks of Rep. Bingham); *id.*, at 23125 (remarks of Rep. Boland); *id.*, at 23128 (remarks of Rep. Kastenmeier). In particular, see *id.*, at 23131 (remarks of Rep.

sent to the Senate.[14] The Senate returned a substantially different bill and the matter was referred to conference.[15]

The Conference Committee adopted the House 133⅓%

Farbstein); *id.*, at 23083 (remarks of Rep. Gilbert); *id.*, at 23092 (remarks of Rep. Burton).

[14] Representative Mills defended the bill against criticism that its treatment of those with income above the categorical assistance limit was unfair. He noted that it was "only because of what we walked into with this program that the committee has seen fit to put limits on it," *id.*, at 23093, and added: "I do not think it is fair to tax people through the general funds of the Treasury to pay for the medical costs of those who undoubtedly have the means to buy insurance and to defray their own medical costs." *Ibid.* See also *id.*, at 23061–23062 (remarks of Rep. Byrnes); *id.*, at 23084–23085 (remarks of Rep. Hanley); *id.*, at 23090 (remarks of Rep. Stratton); *id.*, at 23090, 23091 (remarks of Rep. McCarthy); *id.*, at 23105 (remarks of Rep. Taft); *id.*, at 22783 (remarks of Rep. Quillen).

[15] In hearings before the Senate Finance Committee, an HEW official recommended that the administration's proposal be adopted. He criticized the House bill and noted that, in States such as Indiana and Texas, 133% of the AFDC payment amount was less than the AFDC standard of need. Social Security Amendments of 1967: Hearings on H. R. 12080 before the Senate Committee on Finance, 90th Cong., 1st Sess., 280 (1967). He pointed out that such a standard could result in exclusion of some of the categorically needy, which he suggested probably had not been intended. *Ibid.* Senator Robert Kennedy also criticized the House proposal, noting that medically needy individuals would not be eligible for Medicaid in some States until their income, after deduction of incurred medical expenses, was less than the standards of need established for the categorically needy. *Id.*, at 784.

The Finance Committee subsequently proposed a bill that provided participating States with federal assistance for Medicaid expenditures made on behalf of any person whose income after the deduction of medical expenses was less than 150% of the OAA standard, which generally was the highest of the cash assistance standards. See S. Rep. No. 744, 90th Cong., 1st Sess., 177 (1967). The Senate bill also introduced a new formula for computing the amount of federal reimbursement under the Medicaid program that was designed to reduce federal matching funds for payments to the medically needy. *Id.*, at 176–177.

The proposals encountered resistance on the Senate floor. Senator Javits, speaking in support of an amendment offered by Senator Kuchel that

AFDC payment standard. H. R. Conf. Rep. No. 1030, 90th Cong., 1st Sess., 63 (1967). It added, however, an express exception for the categorically needy. *Ibid.* Opposition to the Conference proposal was voiced in both the House and the Senate.[16] The 133⅓% AFDC payment standard nevertheless was approved by Congress and enacted into law as § 1903(f) of the Social Security Act. See 81 Stat. 898, as amended, 42 U. S. C. § 1396b(f).[17]

---

would have substituted the proposals of the administration, criticized the Finance Committee bill on the ground that it discriminated against the medically needy. See 113 Cong. Rec. 33168, 33169 (1967). In response, Senator Long acknowledged that the bill discriminated against the medically needy, but explained that it "encourages the State to concentrate its medical assistance for those who are most in need, those who qualify for public welfare assistance." *Id.*, at 33169, 33171. The Senate rejected the Kuchel amendment and adopted the Finance Committee bill.

[16] See *id.*, at 36380 (remarks of Rep. Burton); *id.*, at 36381 (remarks of Rep. Gilbert); *id.*, at 36385 (remarks of Rep. Reid); *id.*, at 36387 (remarks of Rep. Ryan); *id.*, at 36389 (remarks of Rep. Farbstein). In the Senate, Robert Kennedy complained that in Mississippi the 133⅓% limitation amounted to an income level, after medical expenses had been incurred, of $80 per month for a family of four. *Id.*, at 36784. Senator Mondale quoted the testimony in the Senate Hearings, see n. 15, *supra*, that in some States the 133⅓% AFDC payment amount was less than the standard of need established under even the AFDC program. 113 Cong. Rec. 36819 (1967).

[17] Title 42 U. S. C. § 1396b(f) provides:

"(f) Limitation on Federal participation in medical assistance

"(1)(A) Except as provided in paragraph (4), payment under the preceding provisions of this section shall not be made with respect to any amount expended as medical assistance in a calendar quarter, in any State, for any member of a family the annual income of which exceeds the applicable income limitation determined under this paragraph.

"(B)(i) Except as provided in clause (ii) of this subparagraph, the applicable income limitation with respect to any family is the amount determined, in accordance with standards prescribed by the Secretary, to be equivalent to 133⅓ percent of the highest amount which would ordinarily be paid to a family of the same size without any income or resources, in the form of money payments, under the plan of the State approved under Part A of subchapter IV of this chapter.

## C

In 1972, Congress replaced three of the four state-administered categorical assistance programs with a new federal program entitled Supplemental Security Income for the Aged, Blind, and Disabled (SSI), 42 U. S. C. § 1381 *et seq.* (1976 ed. and Supp. IV).[18] The SSI program establishes a federally

---

"(2) In computing a family's income for purposes of paragraph (1), there shall be excluded any costs (whether in the form of insurance premiums or otherwise) incurred by such family for medical care or for any other type of remedial care recognized under State law.

.    .    .    .    .

"(4) The limitations on payment imposed by the preceding provisions of this subsection shall not apply with respect to any amount expended by a State as medical assistance for any individual—

"(A) who is receiving aid or assistance under any plan of the State approved under subchapter I, X, XIV or XVI, or part A of subchapter IV, or with respect to whom supplemental security income benefits are being paid under subchapter XVI of this chapter, or

"(B) who is not receiving such aid or assistance, and with respect to whom such benefits are not being paid, but (i) is eligible to receive such aid or assistance, or to have such benefits paid with respect to him, or (ii) would be eligible to receive such aid or assistance, or to have such benefits paid with respect to him if he were not in a medical institution, or

"(C) with respect to whom there is being paid, or who is eligible, or would be eligible if he were not in a medical institution, to have paid with respect to him, a State supplementary payment and is eligible for medical assistance equal in amount, duration, and scope to the medical assistance made available to individuals described in section 1396a(a)(10)(A) of this title, but only if the income of such individual (as determined under section 1382a of this title, but without regard to subsection (b) thereof) does not exceed 300 percent of the supplemental security income benefit rate established by section 1382(b)(1) of this title,

at the time of the provision of the medical assistance giving rise to such expenditure."

[18] The SSI program is funded and administered by the Federal Government. As its name indicates, it replaced the categorical assistance programs for the aged, the blind, and the disabled. The AFDC program continues to be administered by the States and is only partially funded by the Federal Government.

In some States the number of individuals eligible for SSI was significantly greater than the number of persons who had been eligible under the

guaranteed minimum income for the aged, blind, and disabled. See *Schweiker* v. *Wilson*, 450 U. S. 221, 223. Under the program, however, the States may (and in some cases must) raise that minimum standard and supplement the benefits provided by the Federal Government. See 42 U. S. C. § 1382e (1976 ed. and Supp. IV). Moreover, if supplemental payments are made to persons who would be eligible for SSI benefits except for the amount of their income, the State also may provide Medicaid benefits to those persons. See 42 U. S. C. § 1396a(a)(10)(C)(ii).[19]

## II

The Commonwealth of Massachusetts has chosen to participate in the Medicaid program and to provide benefits—to the extent that federal financial assistance is available—to the "medically needy." The State also has elected to make supplementary payments to individuals who are eligible for SSI benefits or who would be eligible except for their income. Finally, the State has chosen to provide Medicaid benefits to those persons who receive supplemental payments. In Massachusetts, $133^1/_3\%$ of the appropriate state AFDC

---

state-administered categorical assistance programs. See *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 38. Since recipients of categorical welfare assistance are also entitled to Medicaid benefits, the expansion of general welfare accomplished by the SSI program increased Medicaid obligations for some States. To guarantee that States would not, for that reason, withdraw from the Medicaid program, Congress offered what has become known as the "§ 209(b) option." Under it, States may elect to provide Medicaid assistance only to those individuals who would have been eligible under the state Medicaid plan in effect on January 1, 1972. See *id.*, at 38–39. Thus, in some States, Medicaid is not automatically available for all of the "categorically needy." Massachusetts is not a § 209(b) State.

[19] There is a limit on federal participation in this aspect of the program. A State is entitled to federal financial assistance for providing Medicaid benefits to a state supplementary payment recipient only if his gross income is less than 300% of the applicable SSI income limitation. See 42 U. S. C. § 1396b(f)(4)(C); n. 17, *supra*.

payment amount is less in some cases than the combined federal SSI and state supplementary payment level.[20]

Appellees filed this suit in 1980 in federal court, contending that § 1903(f) of the Act—as applied in Massachusetts—violates the equal protection component of the Fifth Amendment.[21] Each of the appellees is either aged, blind, or disabled, but they are not categorically needy. For each appellee or his spouse was employed at one time and paid "Social Security" taxes. Each appellee (or his spouse) currently receives Social Security benefits (Federal Old-Age, Survivors, and Disability Insurance, 42 U. S. C. § 401 *et seq.* (1976 ed. and Supp. IV)) in an amount that renders him ineligible for either SSI benefits or state supplementary payments. Appellees challenged the fact that, since 133⅓% of the Massachusetts AFDC payment level is for them lower than the SSI payment level, they are ineligible for Medicaid until their income, after deduction of incurred medical expenses, is less than that of SSI payment recipients. By reason of the Social Security benefits that they receive, appellees thus have less income available for nonmedical expenses than individuals who—possibly because they never worked and receive no Social Security benefits—are dependent upon public assistance for support.[22]

---

[20] There is no statutory requirement that state AFDC payment amounts be comparable to state supplemental benefits.

[21] See *Bolling* v. *Sharpe*, 347 U. S. 497, 499. Appellees also contended that certain state statutory provisions violated the Equal Protection Clause of the Fourteenth Amendment.

[22] Appellees alleged that federal and state provisions require an individual to apply for and to accept all Social Security benefits for which he is eligible as a condition of application for SSI and Medicaid benefits. See 42 U. S. C. § 1382(e)(2).

Appellees' grievances are best illustrated by the situation of appellee Hunter. The District Court found that Hunter had worked for 41 years and had paid Social Security taxes during that period. As a result, he received at the time of trial $534 per month in Social Security benefits, $20 of which apparently was disregarded in computing eligibility for SSI and state supplementary payments. As a result of his income, Hunter was in-

The District Court granted appellees' motion for partial summary judgment.[23]   It ruled that the Massachusetts Medicaid program was unconstitutional insofar as it forced Social Security recipients to incur medical expenses that reduced their remaining income to an amount below SSI payment levels.   The court later declared explicitly that § 1903(f) of the Act, 42 U. S. C. § 1396b(f), is unconstitutional as applied in Massachusetts.   App. to Juris. Statement 25a.   We noted probable jurisdiction.   454 U. S. 891.

### III

In this Court, for the first time, appellees contend that the Social Security Act itself compels the conclusion that, if Medicaid services are provided to the "medically needy," those persons may not be forced to incur medical expenses that

---

eligible for either SSI or state supplemental payments; the "standard of need" under those programs was $513 per month.   If he had qualified, he of course would also have been eligible for Medicaid.   Since the applicable AFDC payment amount in Massachusetts was $300, Hunter was ineligible for Medicaid until his income, after deduction of incurred medical expenses, was no higher than $400.   Hunter regularly incurred over $200 each month in medical expenses; thus, by reason of his Social Security benefits, he had less income available for nonmedical needs ($400 per month) than he would have had on public assistance ($513 per month).   In his case, a Social Security payment of $1 less each month ($534 less $20 less $1) would apparently have rendered him fully eligible for Medicaid.   See *Hogan* v. *Harris*, 501 F. Supp. 1129, 1132 (Mass. 1980).   In other words, if his gross income were reduced by $1, he would receive over $100 in additional medical benefits and have that additional amount of income available for nonmedical needs.

[23] The District Court certified a class "consisting of all (i) present and future Social Security recipients; (ii) who reside or will reside in Massachusetts; (iii) who are or will be disabled or 65 years old or older; (iv) who are or will be ineligible because of the amount of their incomes for Massachusetts Supplemental Security Income payments; and (v) who have or will have, as determined in accordance with the applicable Massachusetts Medicaid regulations, medical expenses not subject to payment by a third party which exceed the difference between their countable incomes under the Massachusetts Medicaid regulations and the applicable Massachusetts Supplemental Security Income standard."   App. to Juris. Statement 23a–24a.

would reduce their remaining income below the applicable public assistance standard. Although appellees did not advance this argument in the District Court, they are not precluded from asserting it as a basis on which to affirm that court's judgment.[24] "Where a party raises both statutory and constitutional arguments in support of a judgment, ordinarily we first address the statutory argument in order to avoid unnecessary resolution of the constitutional issue." *Blum* v. *Bacon, ante,* at 137. See *Harris* v. *McRae,* 448 U. S., at 306–307.

Appellees contend that a "fundamental Congressional purpose in the creation of the medically needy feature of Title XIX was to achieve equity between public assistance recipients and others similarly situated." Brief for Appellees 12. In support of this contention, appellees cite the requirement first imposed in 1965 that States "include reasonable standards *(which shall be comparable for all groups)* for determining eligibility for and the extent of medical assistance under the plan . . . ," 79 Stat. 346 (emphasis added), as amended, 42 U. S. C. § 1396a(a)(17), and note the statements in the legislative history that a State could not require an individual to use, for medical expenses, income "which would bring the individual below the test of eligibility under the State plan." See n. 7, *supra.*

Moreover, appellees contend that this "comparability requirement" was not changed by the enactment of § 1903(f) in 1968. Appellees argue that the separate bills passed in both the House and the Senate would have affected *both* the categorically and the medically needy.[25] Only when the Confer-

---

[24] "It is well accepted . . . that without filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below." *Blum* v. *Bacon, ante,* at 137, n. 5. The statutory argument raised by the appellees, although not presented in the District Court, may be decided on the basis of the record developed in that court.

[25] See n. 12, *supra.* Since the limitation in the Senate bill was set at 150% of the OAA assistance standard, by definition it would not likely have

ence Committee accepted the House provision and added an exception for the categorically needy, appellees argue, did the 1968 modification potentially change the comparability requirement between the two groups. Appellees assert that such a change was not intended; rather, they argue that the exception for the categorically needy was added only to ensure that they would not be adversely affected by § 1903(f). Appellees assert that the medically needy were not similarly excepted from the 133⅓% rule in those States in which that figure was less than the applicable standard of need because, in 1967, those States did not have medically needy programs.

Thus, appellees urge that we construe § 1903(f) to require the medically needy to incur medical expenses until their income is 133⅓% of the AFDC payment amount or—to maintain comparability—100% of the combined SSI-state supplementary payment level *if that figure is higher.* Appellees argue that the legislative history of the 1965 and 1967 Amendments to the Social Security Act justifies a departure from the literal language of § 1903(f) and the Secretary's interpretation of that provision.

We cannot agree. Congress explicitly stated in § 1903(f) that federal reimbursement for benefits provided to the medically needy was available only if the income of those persons, after the deduction of incurred medical expenses, was less than 133⅓% of the state AFDC payment level. In specifically excepting the categorically needy from this rule, Congress recognized that this amount could be lower than categorical assistance eligibility levels. There is no basis in either the statute or the legislative history for appellees' argument that Congress implicitly "assumed" that those States in which 133⅓% of the AFDC payment level was less than the applicable standard of need simply would not provide assistance to the medically needy. Even if this were

---

affected the categorically needy. In any event, appellees contend that both bills were consistent with a comparability requirement.

true in 1967, the Medicaid program then was less than two years old; Congress was aware that many States were in the process of adopting Medicaid programs.[26]  To assume that Congress was unaware that § 1903(f)—which applied only to the medically needy—could operate in those States—which Congress knew existed—in which 133⅓% of the AFDC payment amount was less than the applicable standard of need is to demean the intelligence of the Congress.  We are not prepared to interpret a statute on the basis of an unsupported assumption that Congress had little idea of what it was doing.[27]

The literal and clear language of § 1903(f) does not conflict with any other provision of the Act.  In both § 1902(a)(10) and § 1902(a)(17), see 79 Stat. 345–346, Congress required comparability among the various "categories" for which federal assistance was available, but these provisions did not require that the medically needy be treated comparably to the categorically needy in all respects.  See n. 6, *supra*.[28]  In-

---

[26] See 1967 House Report, at 117–118.

[27] Moreover, appellees' "congressional ignorance" argument rests on another unsupportable premise.  Appellees assume that the House bill—which they admit was vigorously debated—had a "comparable" effect on the categorically and the medically needy.  That bill, however, did not propose an amendment to § 1902(a)(10) of the Act, 42 U. S. C. § 1396a (a)(10), which required that Medicaid coverage be provided to *all* the categorically needy.  It is much more likely—in light of § 1902(a)(10)—that the House assumed that its proposed limits on federal participation in the Medicaid program would affect only the medically needy.  See Hearings on H. R. 12080, *supra* n. 15, at 280 (describing the possibility that the House bill would affect the categorically needy as a "drafting error").  This assumption was made explicit by the Conference Committee, which chose the House standard but added—with little discussion—a direct exception for the categorically needy.

[28] Relying on 42 U. S. C. §§ 1396a(a)(10)(C)(i) and 1396a(a)(17), courts have concluded that certain treatment of the medically needy must be comparable to that afforded to the categorically needy.  See *Caldwell* v. *Blum*, 621 F. 2d 491 (CA2 1980), cert. denied, 452 U. S. 909; *Fabula* v. *Buck*, 598 F. 2d 869 (CA4 1979); *Greklek* v. *Toia*, 565 F. 2d 1259 (CA2 1977), cert. denied *sub nom. Blum* v. *Toomey*, 436 U. S. 962; *Aitchison*

deed, such a broad comparability requirement would be inconsistent with the fact that Congress provided in 1965 that the medically needy could be excluded entirely from the Medicaid program. Moreover, § 1903(f) is not inconsistent with the congressional intent, see n. 7, *supra*, that medical expenses be considered in determining, where appropriate, an individual's eligibility for Medicaid. In § 1903(f) Congress determined that federal assistance would not be available for payments made to individuals whose income, after deduction of incurred medical expenses, was greater than 133⅓% of applicable state AFDC payments. Congress determined that, so long as an individual retained that level of income to meet basic needs, he need not receive reimbursement for medical expenses. That income level might appear unreasonably low, but it is the level that Congress chose. We find no inconsistency between § 1903(f) and § 1902(a)(17).

In sum, we see no reason to ignore the literal language of § 1903(f). Moreover, this analysis is consistent with the Secretary's interpretation of that statutory provision. "We have often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." *Blum* v. *Bacon, ante,* at 141. We hold that the discrimination challenged in this case is required by the Social Security Act.

## IV

Appellees also contend—and the District Court held—that § 1903(f), as applied in Massachusetts, irrationally discriminates between the categorically and the medically needy.[29]

---

v. *Berger*, 404 F. Supp. 1137 (SDNY 1975), aff'd, 538 F. 2d 307 (CA2 1976), cert. denied, 429 U. S. 890. Whatever the scope of the requirement of comparability between the categorically and the medically needy, it is clear that the Act does not require the income of medically needy persons—after the deduction of incurred medical expenses—to be at least comparable to that of the categorically needy.

[29] The discriminatory impact challenged in this case arises solely from the fact that Massachusetts has chosen to supplement SSI payments to an extent that exceeds 133⅓% of state AFDC payment levels. It is not

The unfairness of the statute stems from the fact that appellees receive less medical assistance, and have less income remaining for their nonmedical needs, than do SSI recipients. The unfairness is accentuated by the fact that the disfavored class consists largely of persons who worked and paid taxes to provide for their retirement while the favored class includes persons who may never have done so. Powerful equities unquestionably support the appellees' claim of unfair treatment.

A belief that an Act of Congress may be inequitable or unwise is of course an insufficient basis on which to conclude that it is unconstitutional. Moreover, the validity of a broad legislative classification is not properly judged by focusing solely on the portion of the disfavored class that is affected most harshly by its terms. *Califano* v. *Jobst*, 434 U. S. 47. In this case, Congress has differentiated between the categorically needy—a class of aged, blind, disabled, or dependent persons who have very little income—and other persons with similar characteristics who are self-supporting. Members of the former class are automatically entitled to Medicaid; members of the latter class are not eligible unless a State elects to provide benefits to the medically needy and unless their income, after consideration of medical expenses, is below state standards of eligibility.[30]

According to the congressional scheme, then, the medically needy may be excluded entirely from the Medicaid program. Before considering the constitutional constraints that may exist if a State chooses to provide benefits to that class, it is appropriate to confront the more basic question whether the

-----

disputed that 133⅓% of the Massachusetts AFDC payment level is higher than federal SSI benefit levels. See 45 Fed. Reg. 31782 (1980); 46 Fed. Reg. 27076 (1981).

[30] Although the arguments in this case have focused on two classes, in fact there are three: (1) the categorically needy; and (2) all others, (a) some of whom have medical expenses that reduce their remaining income to a level that qualifies them as medically needy, and (b) some of whom are neither categorically needy nor medically needy.

optional character of the program for the medically needy is itself constitutionally permissible.

In establishing public assistance programs, Congress often has determined that the Federal Government cannot finance a program that provides meaningful benefits in equal measure to everyone. Both federal and state funds available for such assistance are limited. In structuring the Medicaid program, Congress chose to direct those limited funds to persons who were most impoverished and who—because of their physical characteristics—were often least able to overcome the effects of poverty. The legislative history of the 1965 Amendments makes clear that this group was not chosen for administrative convenience. "These people are the most needy in the country and it is appropriate for medical care costs to be met, first, for these people."[31] A decision to allocate medical assistance benefits only to the poor does not itself violate constitutional principles of equality; in terms of their ability to provide for essential medical services, the wealthy and the poor are not similarly situated and need not be treated the same. It is rational to distribute public assistance benefits on the basis of the income and resources available to potential recipients.

In choosing to require coverage only for the categorically needy, Congress permitted States to exclude from the program many persons who—by reason of large medical expenses—often were just as much in need of medical assistance as the categorically needy. Yet Congress found these persons "less needy." 1965 House Report, at 66. By reason of the greater income available to them, as a class these persons generally are better able to provide for their medical needs. In the legislative history of the 1967 Amendments, see *supra*, at 577–580, and n. 14, Congress noted that these persons often are able to prepare for future medical expenses

---

[31] 1965 House Report, at 66.

through private insurance or through participation in the Medicare program.

In *Fullington* v. *Shea*, 404 U. S. 963, this Court affirmed a decision of a three-judge District Court holding that it was constitutional for the State of Colorado to provide benefits to the categorically needy but not to the medically needy. We decided *Fullington* summarily. It is clear that a decision to allocate scarce assistance benefits on the basis of an assumption that persons with greater incomes generally are better able to prepare for future medical needs is not inconsistent with constitutional principles of equal treatment. In other words, it is rational to define need on the basis of income, even though some persons with greater income—who have been unable or unwilling to save enough of their earnings to prepare for future medical needs—may actually be in greater need of assistance than those with less gross income. Although some "medically needy" persons have less income available for nonmedical expenses than those who receive categorical assistance, the broad legislative classification does not involve the type of arbitrariness that is constitutionally offensive.[32]

Appellees do not challenge the decision in *Fullington.* They do not contend that it is irrational to deny benefits entirely to the medically needy. Thus, they do not challenge the line drawn by Congress to separate the class that receives favored treatment from the class that does not. Appellees attack only the manner in which one of the separate

---

[32] See *Schweiker* v. *Wilson*, 450 U. S. 221, 238 ("This Court has granted a 'strong presumption of constitutionality' to legislation conferring monetary benefits, *Mathews* v. *De Castro*, 429 U. S., at 185, because it believes that Congress should have discretion in deciding how to expend necessarily limited resources"). The fact that the recipient of a governmental benefit—such as an indigent defendant who is represented by a public defender—may in some cases be better off after receiving the benefit than a wealthier person who did not qualify to receive it does not undermine the validity of the basis for determining eligibility.

classes is affected by the program. They argue that if medical benefits are made available to a class of persons who are not categorically needy, it is constitutionally impermissible to deny them benefits if their income, after the deduction of incurred medical expenses, is lower than that of an individual who receives public assistance.

In view of the unchallenged decision in *Fullington*, appellees' constitutional argument is self-defeating. The injury that they regard as inconsistent with constitutional principles of equal treatment could be avoided by denying them *all* Medicaid benefits, thus placing them in a worse position financially than they are in now. No interest in "equality" could be furthered by such a result. If a State may deny all benefits to the medically needy—while providing benefits to the categorically needy and rendering some persons who are on public assistance better off than others who are not—a State surely may narrow the gap between the two classes by providing partial benefits to the medically needy, even though certain members of that class may remain in a position less fortunate than those on public assistance.

The validity of the distinction between the categorically needy and the medically needy is not undermined by § 1903(f), because the impact of that provision falls entirely on persons who are not within the categorically needy class. See n. 30, *supra*. The function of the 133⅓% AFDC payment rule is to place a limit on the availability of reimbursement for potential members of the "medically needy" class. That rule prevents some persons (although not the appellees) from qualifying as medically needy; it also determines the extent to which the medically needy are reimbursed for their medical expenses. Yet appellees do not challenge the fact that, among persons who do not receive public assistance, some are treated differently from others. In other words, they do not complain of any discrimination within the class (all persons who are not categorically needy)

in which the rule performs its entire function.[33]   Nor do they argue that Congress chose an eligibility level that is unrelated to ability to provide for medical needs.

The fact that Massachusetts, unlike the State of Colorado in *Fullington*, has provided Medicaid benefits to the medically needy—and in doing so has defined eligibility for persons who are not categorically needy on the basis of incurred medical expenses—does not force it to make immediate medical need the sole standard in its entire Medicaid program. Massachusetts in essence has determined that those individuals whose gross income is greater than public assistance levels are ineligible for Medicaid, *unless medical expenses in any computation period reduce available income to 133¹/₃% of the state AFDC payment level.*   By adding the qualifying clause, which the State of Colorado did not, Massachusetts did not offend any constitutional interest in equality.   Accordingly, without endorsing the wisdom of the particular standard that Congress selected—a matter that is not for us to consider—we conclude that it violates no constitutional command.   The judgment of the District Court is reversed. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[33] The fact that the amount of benefits payable to persons within the medically needy class is determined on the basis of income remaining *after* medical expenses have been incurred does not impeach the rationality of defining the basic distinction between the categorically needy and all others on the basis of income *before* medical expenses are considered.