George HOGAN, et al., Plaintiffs,

v.

Margaret HECKLER, et al., Defendants,

and

Don CARTER, et al., Plaintiffs,

v.

Joseph GALLANT, et al., Defendants.

Civ. A. Nos. 80–883–T, 83–0119–F.

United States District Court,
D. Massachusetts.

Nov. 13, 1984.

Steven A. Hitov, Western Mass Legal Services, Springfield, Mass., Nancy Nemon, Deputy Regional Atty., Dept. of HHS, Boston, Mass., for Carter.

Judith C. Saltzman, Greater Boston Legal Services, Boston, Mass., for Hogan.

Ralph A. Child, Asst. U.S. Atty., Boston, Mass., Felix Baxter, Jose I. Sandoval, Lewis K. Wise, Dept. of Justice, Civil Div., Washington, D.C., H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., Carol Booth, Andrea Mintz, Developmental Disabilities Law Center, Springfield, Mass., William H. Simon, Legal Services Institute, Jamaica Plain, Mass., Mark Coven, Greater Boston Elderly Legal Services, Boston, Mass., Gill Deford, Nat'l Senior Citizens Law Centre, Los Angeles, Cal., for Heckler.

## MEMORANDUM

TAURO, District Judge.

Plaintiffs in these consolidated actions contend that the Massachusetts Medicaid program's six-month "spenddown" requirement for certain Medicaid applicants violates provisions of the Social Security Act and federal regulations. The case is before the court on plaintiffs' motions for class certification and partial summary judgment and defendants' motion for summary judgment. For the reasons stated below, the plaintiffs' motions are granted and the defendants' motion is denied.

### I.

### *Background*

Title XIX of the Social Security Act established the Medicaid program in 1965 "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). States that participate in the program must provide medical assistance to the "categorically needy"—those who receive federally subsidized cash assistance grants (AFDC or SSI). 42 U.S.C. § 1396a(a)(10)(A) (1982). Participating States may, but are not required to, provide medical assistance to the "medically needy"—families with dependent children (AFDC-related) or the aged, blind or disabled (SSI-related) who do not qualify for AFDC or SSI but whose income and resources are insufficient to meet the cost of medical care. 42 U.S.C. § 1396d(a). The medically needy include those whose incomes are below the Medicaid level set by the State as well as those whose incomes exceed that level, but who have offsetting medical expenses. 42 C.F.R. § 435.831 (1983). The amount that an applicant's income exceeds the Medicaid income limit is called the "spenddown" amount, as it is the amount that the applicant must spenddown

in medical expenses before he or she may qualify for assistance.

Massachusetts has chosen to participate in the Medicaid program and to provide coverage for the medically needy. Mass. Gen.Laws Ann. ch. 118E (West Supp.1984). Massachusetts calculates the spenddown amount over a six-month period. An individual, therefore, must incur medical expenses equal to six times his monthly excess before Medicaid will begin to reimburse him.[1] For example, a person whose monthly income exceeds Medicaid limits by one hundred dollars must incur six hundred dollars in medical expenses before becoming eligible for Medicaid.

Plaintiffs in *Hogan v. Heckler*, No. 80-883–T, filed suit in 1980, challenging several aspects of Massachusetts' Medicaid program for the medically needy. Plaintiffs' first objection involved § 1903(f) of the Medicaid Act, 42 U.S.C. § 1396b(f), which bars a State from setting the income limits for the medically needy any higher than four-thirds of the AFDC limit in the State. In Massachusetts, where SSI benefits generally exceed AFDC benefits by more than four-thirds, this provision leads to the anomolous result that aged, blind, or disabled persons with high medical expenses, but who do not qualify for SSI, are left with less income for their non-medical expenses than SSI recipients.[2] This court found the classification to be without a rational basis and thus unconstitutional. *Hogan v. Harris*, 501 F.Supp. 1129 (D.Mass.1980). The Supreme Court reversed in *Schweiker v. Hogan*, 457 U.S. 569, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982). The Court noted that "[p]owerful equities unquestionably support the [plaintiffs'] claim of unfair treatment," *id.* at 589, 102 S.Ct. at 2609, but found the scheme rational. Since Massachusetts could permissibly withhold all benefits to the medically needy, the Court reasoned that the State's qualification on assistance to the medically needy was constitutional. *Id.* at 593, 102 S.Ct. at 2612.

Left unaddressed by those decisions was plaintiffs' contention that Massachusetts' six-month spenddown policy for the medically needy violates the Medicaid statute's provisions mandating comparability of treatment between the medically needy and the categorically needy. 42 U.S.C. § 1396a(a)(10), (a)(17). Since Massachusetts uses a one-month budget period for the SSI-related categorically needy, plaintiffs contend that Massachusetts must also apply a one-month budget period to the spenddown of a medically needy applicant. Alternatively, plaintiffs argue that applicants should be allowed to anticipate six months of medical expenses against six months of excess income.

## II.

### Plaintiffs

Plaintiffs seek to represent a class composed of all Massachusetts SSI-related medically needy who would be subjected to the State's six-month spenddown requirement in order to qualify or requalify for Medicaid benefits. Since neither defendant apparently opposes the plaintiffs' motion for class certification and, in any event, plaintiffs satisfy the requirements of Fed. R.Civ.P. 23, certification is allowed.

1. Mass.Gen.Laws ch. 118E, § 10 provides, in pertinent part:

    In any case where the monthly income of a recipient or beneficiary is in excess of the exemptions allowed, the recipient or beneficiary shall be liable to pay to the provider of medical care or services an amount which shall be equal to the excess income for a period of six consecutive months, which includes the period when such service was provided.

2. Plaintiffs (or their spouses) had worked and were receiving Social Security benefits in amounts that made them ineligible for SSI benefits. The Medicaid income limit (at four-thirds of the AFDC limit) was, for them, lower than the SSI benefit level. Therefore, plaintiffs did not qualify for Medicaid until their income, after deducting medical expenses, was lower than the benefits received by SSI recipients. In other words, if plaintiffs had not worked and not qualified for Social Security, they would have qualified for SSI benefits and would have had more income available for non-medical expenses.

Among the named plaintiffs is Don Carter, a quadraplegic who requires the services of a personal care attendant ("PCA") to accomplish the functions of daily living.[3] Mr. Carter receives a veteran's pension and Social Security disability benefits totalling $743.76 per month. His PCA services cost $202.00 per week or about $875.27 per month. The Department of Public Welfare ("Department") has calculated that Mr. Carter has "excess" income of $390.76 per month.[4] To qualify for Medicaid, Mr. Carter must incur medical expenses equal to six times his monthly excess, or about $2300.

The Department's policy leaves Mr. Carter with two options. He can go begging for credit, trying to find a PCA who is willing to work for months without getting paid. Mr. Carter was successful at this for awhile, but on the evening of November 1, 1982, his PCA, having gone unpaid for the three previous weeks, abandoned him. Mr. Carter's second option is to obtain higher cost medical care so that his "excess" income is spent down faster. This is what he ended up doing, although not by choice. After he was abandoned by his PCA, Mr. Carter was admitted for emergency care at the Western Massachusetts Hospital, where he remained for two months while his expenses caught up with the Department's projection of his income.[5] The cost of the Department's six-month spenddown policy is measurable, therefore, both in terms of its potentially devastating impact on a human being, as well as by predictably higher expenditures of tax dollars for persons like Mr. Carter, who are forced into high-cost institutional care.[6]

Massachusetts has apparently recognized the problems of people like Mr. Carter and has proposed a "targeted" one-month spenddown for the chronically ill and disabled who require ongoing, non-acute health care. 1983 Mass.Acts ch. 720.[7] In July 1984, the Department submitted this proposal to the Secretary of Health and Human Services for approval.[8] The Department argues against giving such relief to all class members for two reasons. First, it asserts that the class consists primarily of applicants who are not significantly burdened by the existing scheme because their medical expenses are only

**3.** The court was informed by counsel that Mr. George Hogan, another named plaintiff, died in early August 1984.

**4.** The Department made this calculation by subtracting $333.00, the Massachusetts income standard for one, and a $20.00 income disregard from Mr. Carter's $743.76 monthly income. *See* 105 C.M.R. §§ 506.110, 506.410 (1983).

**5.** The hardship wrought by the Department's six-month spenddown period is compounded by the fact that even if Mr. Carter does meet his spenddown, he must reapply for assistance (and meet the spenddown) every six months.

**6.** Persons like Mr. Carter are also apt to seek out long-term institutional care for which the State provides a one-month spenddown. 106 C.M.R. §§ 506.600–620 (1983).

**7.** The Department submitted a request that the Secretary waive several regulations to enable the State to implement its project. The Department's submission to the Secretary noted that a six-month spenddown policy:

   may well impose a hardship on many chronically ill and disabled individuals who require medical services on a daily, weekly or month-

ly basis in order to remain in the community. It may be extremely difficult or impossible for many of these individuals to both pay medical expenses sufficient to meet their six-month spenddown and maintain funds needed for food, shelter, and family support. They may instead find themselves having to choose between: foregoing necessary non-institutional medical care; submitting to costly and inappropriate hospitalization in order to incur medical expenses in excess of the six-month spenddown liability; or entering a nursing home in order to receive Medicaid coverage via a one-month spenddown. All of these options are ultimately more costly, both socially and economically. The individual is forced by financial imperatives either to physically suffer or to submit to unnecessarily intensive or restrictive inpatient care, the cost of which will likely be borne by Medicaid and Medicare.

Department of Public Welfare, *Preventing Unnecessary Institutionalization of the Chronically Ill and Disabled: A One Month Spenddown Program,* iv-v (July 5, 1984).

**8.** The defendants argue that the Secretary's approval of the State's proposal would make plaintiffs' claims moot with regard to a portion of the plaintiff class.

occasionally greater than their excess incomes in a given month. Second, the Department estimates that a one-month spenddown for all medically needy applicants could cost an additional $208 million per year. The plaintiffs challenge the Department's characterization of the class as well as its cost estimate of a universal remedial program.

### III.

### *Eligibility Methodology*

Section 1396a(a)(10)(C)(i)(III) of the Medicaid statute requires that States use the "same methodology" to determine the income and resource eligibility for both the medically needy and the categorically needy.[9] Plaintiffs maintain that Massachusetts, by employing a six-month spenddown period for the SSI-related medically needy and a one-month budget period for SSI applicants, uses different eligibility methodologies for the two groups.

The Department maintains that it does use the same methodology in determining the income and resource eligibility for both SSI and for SSI-related Medicaid. Its position is that the calculation of the spenddown—the amount of medical expenses that must be incurred for eligibility—is an extra step unique to Medicaid and distinct from the methodology of determining income. The Department's argument ignores the reality of the situation. The spenddown amount is a critical factor in determining the resource and income eligibility of a medically needy applicant. Plainly, the amount an applicant must spend on medical bills is income not available for food, clothing and shelter. The Medicaid statute recognizes this and mandates that States shall "provide for flexibility in the application of [eligibility] stan-

dards with respect to income by taking into account, except to the extent prescribed by the Secretary, the costs ... incurred for medical care or for any other type of remedial care recognized under State law ...." 42 U.S.C. § 1396a(a)(17).

Massachusetts' six-month spenddown requirement means that medically needy applicants who demonstrate need in particular months may not receive benefits, or may have to wait several months before receiving benefits. The State's one-month budget period for SSI, on the other hand, enables the categorically needy to get aid in any month they demonstrate financial need. Realistically, therefore, the length of the spenddown period is part of the methodology for evaluating income eligibility. The methodologies the Commonwealth uses in determining the eligibility of the categorically and medically needy are so substantively different as to constitute the type of disparate treatment that is prohibited by law.

This interpretation of the "same methodology" requirement of § 1396a(a)(10)(C)(i)-(III) is buttressed by the legislative history of the provision. The "same methodology" language was added to the Medicaid law by the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324 ("TEFRA") after the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357 ("OBRA") had deleted language requiring States to use comparable eligibility standards for their medically needy programs.

Prior to OBRA, § 1396a(a)(10)(C)(i) required that if a State provided medical assistance to the medically needy, the State had to provide

  (i) for making medical assistance available to all individuals who would, except

---

**9.** Section 1396a(a)(10)(C)(i) provides, in pertinent part, that if a State Medicaid plan provides medical assistance to the medically needy, then the plan must describe

  ... (III) the single standard to be employed in determining income and resource eligibility for all such [medically needy] groups, and the methodology to be employed in determining such eligibility, which shall be the same meth-

odology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a State in which such program is in effect, and which shall be the same methodology which would be employed under the appropriate State plan ... to which such group is most closely categorically related in the case of other groups....

for income and resources, be eligible for [AFDC or SSI], and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical and remedial care and services . . . .

42 U.S.C. § 1396a(a)(10)(C)(i) (1976).

OBRA deleted this comparability language and substituted the requirement that

(i) the plan must include a description of (I) the criteria for determining eligibility of individuals in the group for such medical assistance and (II) the amount, duration, and scope of medical assistance made available to individuals in the group.

95 Stat. 807 (1981).

The Managers of the OBRA Conference Committee Report indicated that the purpose of the statutory change was to provide States "with flexibility in establishing eligibility criteria and scope of services *within* the medically needy program to address the needs of different population groups more appropriately." H.R.Rep. 97–208, 97th Cong., 1st Sess. 971, reprinted in 1981 U.S.Code Cong. & Ad.News 1333 (emphasis added).

Pursuant to the statutory change, the Department of Health and Human Services adopted an interim final rule allowing States vast flexibility with their medically needy programs. The regulation provided that

States are no longer required to apply a uniform methodology for treating income and resources in such matters as deemed income, interest, court-ordered support payments, and infrequent and irregular income. Rather, the State plan must specify the methodology that will be used; and that methodology must be reasonable. . . .

46 Fed.Reg. 47,980 (1981).

With this regulation, the Secretary had gone beyond the intent of Congress in OBRA. So, in TEFRA in 1982, Congress responded by adding part III to the subsection—the current language requiring States to use the same methodology for the categorically and medically needy. The report of the House Committee on Energy and Commerce states:

Section 106(e)(2) of the Committee bill clarifies the treatment of income and resource standards and methodologies for the medically needy. The 1981 Reconciliation Act gave the States certain specified flexibility in designing their medically needy programs. They are no longer required to cover all eligibility groups. . . . However, the 1981 Reconciliation Act made no changes in the applicable income and resource eligibility rules.

Unfortunately, the Department, in its interim final rule of September 30, 1981, 46 Fed.Reg. 47976, assumed that the conferees had intended to give the States extensive flexibility in this area as well. This is simply incorrect. When the Statement of Managers of the conference committee report spoke of providing the States "with flexibility in establishing eligibility criteria and scope of services within the medically needy program to address the needs of different population groups more appropriately," (H.R.Rep. 97–208, p. 971), it was referring to the service package and coverage group provisions, not inviting a wholesale rewriting of current income and resource standards and methodologies. This amendment makes clear that the Department had no authority to alter the rules that applied before September 30, 1981 with respect to medically needy income levels, medically needy resource standards, and the methodology for treating medically needy income and resources. The Committee bill reaffirms the financial requirements previously in effect for the medically needy. . . .

H.R.Rep. No. 97–757, Part I, 97th Cong. 2d Sess. 13 (1982).

This legislative history demonstrates that Congress did not intend to alter the comparability requirement between the medically and categorically needy. *See also infra* pt IV. Moreover, it shows that

the "methodology" that Congress had in mind related, at least implicitly, to budget periods, as the HHS regulation specifically referred to "such matters as infrequent and irregular income." The method by which infrequent income is accounted for is simply the flipside of the method by which infrequent medical expenses are accounted for.

The interpretation is also supported by the other courts that have addressed the question. The Massachusetts Superior Court and a federal district court have recently ruled that budget periods are part of the methodology for determining eligibility and must be the same for the medically and categorically needy under 42 U.S.C. § 1396-a(a)(10)(C)(i)(III). *Rivera v. Atkins*, No. 83–684 (Mass.Sup.Ct.Hamden Co. Mar. 26, 1984) (invalidating six-month spenddown for the AFDC-related medically needy) (appeal pending); *Coleman v. Miller*, No. 82–C–6259 (N.D.Ill. Feb. 23, 1984) (same) (appeal pending); *see also Brogan v. Miller*, 537 F.Supp. 139 (N.D.Ill.1982) (invalidating six-month spenddown for SSI-related medically needy because, inter alia, it was not comparable to categorically needy budget period).

## IV.

### *Comparability of Standards*

Plaintiffs also contend that the State's six-month spenddown policy violates 42 U.S.C. § 1396a(a)(17) which requires that a State plan

> include reasonable standards (which shall be comparable for all groups ...) for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income and resources as are ... available to the applicant or recipient and ...
>
> (C) provide for reasonable evaluation of any such income or resources ....

When Congress deleted the comparability language from § 1396a(a)(10)(C), *see su-*

*pra,* the Managers of OBRA stated that "it is not the intention of the conferees to alter the requirements under section 1902(a)17 [42 U.S.C. § 1396a(a)(17)] of the Social Security Act relating to comparable treatment of income and resources between categorically needy and medically needy programs." 127 Cong.Rec. S9218 (daily ed. Aug. 3, 1981) (statement of Senator Dole).

Several federal courts, relying on § 1396a(a)(17) and/or the comparability language of § 1396a(a)(10)(C) (pre-OBRA) have invalidated state Medicaid provisions that applied more restrictive standards to the medically needy than the categorically needy. *See Beltran v. Myers*, 701 F.2d 91 (9th Cir.) (per curiam) (transfer of assets rule invalidated), *cert. denied*, —— U.S. ——, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); *Calkins v. Blum*, 675 F.2d 44 (2nd Cir.1982) (per curiam) (different income disregards held invalid); *Caldwell v. Blum*, 621 F.2d 491 (2nd Cir.1980) (transfer of assets rule invalidated), *cert. denied*, 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 412 (1981); *Fabula v. Buck*, 598 F.2d 869 (4th Cir.1979) (same); *Greklek v. Toia*, 565 F.2d 1259 (2nd Cir.1977) (per curiam) (different treatment of work-related expenses invalidated), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978).

Massachusetts' six-month spenddown and budget period for the medically needy is not comparable to its one-month budget period for the categorically needy. *Schweiker v. Hogan, supra,* is not to the contrary. In *Schweiker,* the Supreme Court noted that § 1396a(a)10 and § 1396a(a)(17) "did not require that the medically needy be treated comparably to the categorically needy in all respects." 457 U.S. at 587, 102 S.Ct. at 2609. *Schweiker* made an exception in the comparability requirement to uphold a specific statutory limitation on the level of medically needy benefits. Here, the statutory comparability requirement conflicts with a state regulation, not with another command of Congress.[10]

---

10. Plaintiffs also maintain that the State's six-

month spenddown policy offends the reason-

 

## V.

### Federal Regulations

Plaintiffs and defendants rely on various federal regulations to support their respective claims. Plaintiffs cite 42 C.F.R. § 435.401(c) (1983), which provides that a State agency "must not use requirements for determining eligibility for optional coverage groups that are ... (2) For aged, blind, and disabled individuals, more restrictive than those used under SSI ...." Defendants rely on 42 C.F.R. § 435.831 (1983), which provides that "[t]he agency must use a prospective period of not more than 6 months to compute income."

Defendants maintain that the agency's specific authorization of a six-month budget period should be read to supercede the more general restriction, which they contend applies to eligibility matters other than budget periods. Plaintiffs respond that this authorization is limited by the statute and other regulations and thus should be ignored or held unlawful. This court agrees.[11]

## VI.

### Conclusion

The court holds that 42 U.S.C. § 1396a(a)(10) and (17) require Massachusetts to employ the same budget period for the evaluation of income and medical expenses for SSI recipients as it does for SSI-related Medicaid applicants. Plaintiffs' motion for partial summary judgment is, therefore, allowed. Defendants' motion for summary judgment is denied.

---

ableness requirement of § 1396a(a)(17). The policy is unreasonable, according to plaintiffs, because "it pretends that SSI-related medically needy applicants have their projected income available to them on the date of application, even though that presumption never comports with reality." Plaintiffs' Brief at 17. Two courts have relied on this logic, at least in part, to invalidate six-month spenddowns. *See Coleman v. Miller, supra; Brogan v. Miller, supra.* Although the six-month spenddown in Massachusetts acts extraordinarily harshly on some of the plaintiffs, *see supra*, it is unnecessary for this court to reach the reasonableness issue, given its disposition of plaintiffs' other claims.

11. Plaintiffs concede that 42 C.F.R. § 435.831, and a six-month spenddown period, could be lawful for some applicants if the State allowed six months worth of expenses to be anticipated against six months worth of excess income. Plaintiffs rely on *Coleman v. Miller, supra,* in which the court found it unnecessary to invalidate this regulation. The court ruled that if the

State could lawfully use a six-month measure of prospective income, then it "would be reasonable to compute eligibility on a six-month prospective basis so long as the same prospective basis is applied to anticipated medical expenses." *Coleman v. Miller,* slip op. at 14 n. 8; *see also Brogan v. Miller, supra* at 146 n. 15 (using same reasoning). Plaintiffs note that this solution would be permissible only for those applicants with consistent, recurring medical needs, and not for those with sporadic needs.

Defendants argue that a State may provide medical assistance to a medically needy applicant only if the applicant actually *incurs* medical expenses equal to his or her spenddown, unless the Secretary authorizes the State to project expenses. Defendants rely on *Williams v. St. Clair,* 610 F.2d 1244, 1248 (5th Cir.1980), which noted that Congress has not required States to take into account anticipated medical expenses.