Essie Mae HARRIS, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Margaret M. HECKLER, as Secretary of the United States Department of Health and Human Services, George J. Albanese, individually and in his capacity as Commissioner of New Jersey Department of Human Services, and Audrey M. Harris, individually and in her capacity as Acting Director of the Division of Public Welfare, New Jersey Department of Human Services, Defendants.

Civ. No. 83–4023.

United States District Court, D. New Jersey.

Nov. 18, 1983.

Legal Services of New Jersey, Inc. by Stephen M. Latimer, Alfred N. Donnarumma, New Brunswick, N.J., Richard S. Semel, Hackensack, N.J., for plaintiffs.

James H. Cooper, Asst. U.S. Atty., Newark, N.J., Dorothy Donnelly, Deputy Atty. Gen., State of N.J., Trenton, N.J., for defendants.

LACEY, District Judge.

## INTRODUCTION

Plaintiffs are former recipients of Aid to Families with Dependent Children ("AFDC") benefits. They challenge the "lump sum rule," under which they were declared ineligible for benefits for a period of time. Defendants administer the AFDC program on the state and federal levels.

The underlying facts are undisputed. Plaintiffs move for a preliminary injunction requiring defendants to pay them AFDC benefits pending the outcome of this suit. (I have already denied their application for a temporary restraining order.) Defendants move for summary judgment. In the meanwhile, plaintiffs have cross-moved for summary judgment and class certification.

I have bypassed the preliminary injunction stage and addressed the summary judgment question directly. Because I could not decide defendant's motion without settling the law of the case, and because the legal issues have been sufficiently aired, this decision disposes of plaintiff's summary judgment motion as well. I will decide the class certification motion upon proper briefing and oral argument.

While on AFDC, each plaintiff came into a sum of money following the death of a relative. Under the lump sum rule, each was declared ineligible for further benefits for a specified period. The period was calculated by dividing the amount of the lump sum by the amount of plaintiffs' monthly grant. The rule thus treats lump sums as the equivalent of future AFDC aid. Each plaintiff, however, has spent the lump sum long before the ineligibility period has run out. Defendants, in accordance with the lump sum rule, denied the applica-

tion of plaintiff Harris for further aid. It appears likely that plaintiff T.E. will have a similar experience.

Were it not for the rule, plaintiffs would probably qualify for AFDC, as they did in the past. Destitute and in need of assistance, ·they challenge the lump sum rule on the following grounds:

(1) That it rightfully applies only to AFDC recipients with earned income, and was therefore wrongly applied to them; and

(2) That it creates an unconstitutional irrebuttable presumption of continuing ineligibility.[1]

In essence, they seek to have their reapplications judged by the same needs test applied to all other applications for AFDC.

### A. *Essie Mae Harris*

Essie Mae Harris was collecting AFDC benefits of $372 per month in October 1981. She used that grant, as well as food stamps and Medicaid, to provide for herself and her daughter. After the death of her nephew, she received an insurance check for $11,568.36. On November 1, 1981 defendants terminated her AFDC benefits until April 1985 under the lump sum rule. Her food stamps and Medicaid eligibility were also cancelled.

By March 1983 the insurance money was gone. Harris had, and has, no other income or assets, so she reapplied for AFDC benefits. Defendants again found her ineligible until April 1985. She appealed. The state Administrative Law Judge reviewed her expenditures. He found that she had spent the money on food, shelter and clothing; indeed her basic living expenses amounted to $17,123, about $5400 in excess

of the lump sum. The state Division of Public Welfare rejected the ALJ's recommendation that she be reinstated.

Harris and her daughter are now destitute. Harris suffers from high blood pressure, asthma, and arthritis, but cannot afford medical care for herself or her daughter. The daughter had a part-time job during the summer, but has now returned to high school. She lacks adequate clothing for the coming winter. The family survives on food stamps (restored in June 1983) and the charity of friends, which is rapidly being exhausted.

### B. *"T.E."*

T.E. received an AFDC grant of $414 per month and a food stamp grant of $154 per month until June 1983. She then received a check for $5329.91 from the estate of her deceased father. She refunded her July AFDC and food stamp payments. Shortly afterward defendants terminated her AFDC benefits until August 1984 under the lump sum rule. She appealed, and the state ALJ recommended reinstatement. Given defendants' adherence to the lump sum rule, reinstatement appears extremely unlikely.

T.E. has spent her small inheritance on family essentials. These included furniture, payments on loans and back tax bills, rent, food, clothing, and medically required air conditioners. She and her husband are unemployed, with no outside sources of income or savings. They have requested assistance from local charities for their food bills. They are now threatened with placement of their two children, aged 12 and 14, with the state Division of Youth and Family Services.

---

**1.** My resolution of the first issue makes it unnecessary to reach the second. Plaintiffs argue that they would be ineligible for AFDC even if the lump sum were stolen, attached by creditors, or otherwise dissipated for reasons beyond their control. *See Vermeulen v. Kheder,* No. K82–135CA4 (W.D.Mich. June 3, 1982) (recipient's reapplication had been denied even though husband had absconded with the lump sum, "leaving the plaintiff the generous sum of $100 for Christmas"). No level of poverty will support a reapplication during the ineligibility period, which can last for years. The only exception is for a life-threatening emergency (not created by the exhaustion of the lump sum, evidently) on which the lump sum has been exhausted. 45 C.F.R. § 233.20(a)(3)(ii)(D) (1982).

In the larger sense, plaintiffs argue that the presumption is unreasonable because AFDC benefits are grossly inadequate to support a reasonable standard of living. Exhaustion of the lump sum is thus inevitable.

## DISCUSSION

### I. *Earned Income and the Lump Sum Rule*

#### A. *The Issue*

Plaintiff challenges the federal regulation setting forth the lump sum rule:

When the AFDC assistance · unit's income, after applying applicable disregards, exceeds the State need standard for the family because of receipt of nonrecurring lump sum income, the family will be ineligible for aid for the full number of months derived by dividing the sum of the lump sum income and other income by the monthly need standard for a family of that size. Any income remaining from this calculation is income in the first month following the period of ineligibility.

45 C.F.R. § 233.20(a)(3)(ii)(D) (1982). This regulation, and the parallel state regulation,[2] apply to all AFDC recipients; the regulations refer only to "a recipient," "the family," or "the AFDC assistance unit." Plaintiffs argue that the regulations are invalid because the authorizing statute meant to apply the lump sum rule only to recipients with earned income. Plaintiffs have no earned income, and thus aver that a properly drafted regulation would not apply to them.

The federal statute giving rise to the challenged regulations limits the applicability of the lump sum rule to "a person specified in paragraph 8(A)(i) or 8(A)(ii)." 42 U.S.C. § 602(a)(17) (Supp. V 1981).[3] Defendants argue that paragraphs 8(A)(i) and (ii) "specify" the entire range of AFDC applicants; plaintiffs argue that those paragraphs specify only recipients with earned income, rendering the regulations fatally overbroad.

The issue, then, is whether paragraphs 8(A)(i) and (ii) specify only those recipients with earned income. Under those paragraphs, a state plan must:

8(A) provide that, with respect to any month, in making the determination [of need] under paragraph (7), the State agency—

(i) shall disregard all of the earned income of each dependent child receiving aid to families with dependent children who is (as determined by the State in accordance with standards prescribed by the Secretary) a full-time student or a part-time student who is not a full-time employee attending a school, college, or university, or a course of vocational or technical training designed to fit him for gainful employment;

(ii) shall disregard from the earned income of any child or relative applying for

---

**2.** Plaintiffs also challenge the parallel state regulation, which is identical for purposes of this issue:

When a recipient receives nonrecurring income (e.g., retroactive SSDI payments, income tax refunds), that income will be added together with all other income received that month by the eligible unit after application of the disregards in N.J.A.C. 10:82–4.7. When this total exceeds the AFDC allowance standards in Tables I or II as appropriate, the family will be ineligible for AFDC for the number of full months derived by dividing this total income by the allowance standard applicable to the eligible unit. Any remaining income received in the first month following the period of ineligibility is considered available for use at that time.

N.J.A.C. 10:82–4.15(a), *adopted* 14 N.J.Admin. Reg. 1459(b) (Dec. 14, 1982) (not yet codified).

**3.** The provision reads in full as follows:

[A state AFDC plan shall] provide that if a *person specified in paragraph 8(A)(i) or 8(A)(ii)*

receives in any month an amount of income which, together with all other income for that month not excluded under paragraph (8), exceeds the State's standard of need applicable to the family of which he is a member—

(A) such amount of income shall be considered income to such individual in the month received, and the family of which such person is a member shall be ineligible for aid under the plan for the whole number of months that equals (i) the sum of such amount and all other income received in such month, not excluded under paragraph (8), divided by (ii) the standard of need applicable to such family, and

(B) any income remaining (which amount is less than the applicable monthly standard) shall be treated as income received in the first month following the period of ineligibility specified in subparagraph (A).

42 U.S.C. § 602(a)(17) (Supp. V 1981) (emphasis added).

or receiving aid to families with dependent children, or of any other individual (living in the same house as such relative and child) whose needs are taken into account in making such determination, the first $75 of total of such earned income for such month (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month) ....

42 U.S.C. § 602(a)(8)(A) (Supp. V 1981). Thus 8(A)(i) and (ii) provide for "earned income disregards," so called. Certain earned income is excluded from the determination of need, doubtless in order to encourage work ·by allowing applicants to keep part of what they earn.

Defendants argue that 8(A)(i) and (ii) specify all AFDC recipients. The paragraphs mention, for example, "each dependent child receiving aid," and "any child or relative applying for or receiving" AFDC. Therefore, the argument runs, all applicants are "specified" in the paragraphs, even if they have no earned income to which the disregard provisions could apply. Plaintiffs counter that the paragraphs specify only those persons to whom the "earned income disregard" provisions actually apply.[4]

### B. *Persons Specified in Paragraph 8(A)(i) or 8(A)(ii)*

In construing § 602(a)(8)(A)(i) & (ii), "our starting point must be the language employed by Congress." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982), *quoting Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979); *Mountain Brook Orchards v. Mar-*

*shall,* 640 F.2d 454, 456 (3d Cir.1981). Absent any contrary indication, I must take the words used to have their ordinary meaning. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1962).

The only definitional issue is the meaning of the word "specified" in § 602(a)(17). Even a court denying a preliminary injunction on this issue conceded that "[i]n common parlance, the word 'specify' contains some connotation of restriction." *Clark v. Harder,* 577 F.Supp. 1085, 1087 (D.Kan. 1983). In using the quoted language, Congress may have been restricting its focus from humanity at large to the world of AFDC applicants. On the other hand, the statute by its very existence implies that level of restriction. Plaintiffs argue with some force that the reference to 8(A)(i) and (ii) must have a more restrictive meaning.

The problem seems to be that paragraphs 8(A)(i) and (ii) "specify" persons in two different ways. First, there is the general class of persons to which the guidelines are applied. Second, there is the narrower class—persons with earned income—that is uniquely defined by those paragraphs. *See Clark, supra,* slip op. at 5 (paragraphs "do not specify 'persons' as much as they specify types and amounts of earned income").

If Congress intended the lump sum rule to apply to all applicants, it is difficult to understand the reference to paragraphs 8(A)(i) and (ii), the only sections of the statute that discuss earned income. For example, paragraph (8) is immediately pre-

---

**4.** Several cases have adopted plaintiffs' argument on this issue. *Walker v. Adams,* No. 83–5527 (6th Cir. Sept. 2, 1983) (preliminary injunction), *rev'g* No. C 83–0574–L(B) (W.D.Ky. July 27, 1983); *Sweeney v. Affleck,* 560 F.Supp. 1118 (D.R.I.1983); *Vermeulen v. Kheder,* No. K82–135CA4 (W.D.Mich. June 3, 1982) (preliminary injunction). One granted a preliminary injunction but expressed some skepticism as to the merits. *Reed v. Lukhard,* 578 F.Supp. 40 (W.D.Va.1983). One rejected plaintiffs' argu-

ment but required a hearing before any cutoff of benefits. *Douthit v. Heckler,* 577 F.Supp. 88 (D.Neb.1983). Others found for defendant outright. *Faught v. Heckler,* 577 F.Supp. 1180 (S.D.Iowa 1983); *Callejas v. McMahon,* No. 83–3136 (N.D.Cal. Sept. 2, 1983); *Clark v. Harder,* 577 F.Supp. 1085 (D.Kan.1983). The *Faught* court found for plaintiff on the earned income issue at the preliminary injunction hearing, but reversed itself on summary judgment.

ceded by paragraph (7), which provides general guidelines for determining the need of all applicants. If Congress insisted on inserting a reference back, it could have done as it did in § 602(a)(31), *i.e.* incorporated paragraph (7) to take in all applicants.

Where Congress meant to make a provision universally applicable, it simply did so.[5] I note in passing that defendants' own regulations took that simple approach.[6] The court in *Sweeney v. Affleck*, 560 F.Supp. 1118, 1124 (D.R.I.1983) found that the language of § 602(a)(17) would be almost meaningless under the construction urged by defendant. *Accord, Vermeulen v. Kheder*, No. 82–135, slip op. at 24 (W.D. Mich. June 3, 1982). I agree; Congress must have referred to paragraphs 8(A)(i) and (ii) for some reason related to their specific content. It would make no sense to refer to two subparagraphs of paragraph (8), dealing specifically with earned

income disregards, to convey the totally unrelated point that the lump sum rule applies to all applicants.[7]

### C. *Congressional Policy*

AFDC is a federal program administered by the states. Its purpose is:

> ... encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services as far as practicable under the conditions in such State ... and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection ....

42 U.S.C. § 601 (1976).[8] The lump sum rule legislation was part of the Omnibus Budget Reconciliation Act of 1981 (OBRA),

---

5. Examples abound. Under § 602(a), containing the paragraphs disputed here, Congress routinely provides that "the state agency shall" apply some standard, without explicitly providing that the standards will apply to all applicants. *See, e.g.,* § 602(a)(13). Section 602(a)(31), mentioned above, simply provides that "in making the determination for any month under paragraph 602(a)(7), the state agency shall take into account ..." There is no plausible reason for Congress to have referred back to § 602(a)(8)(A)(i) and (ii), a provision specifically devoted to the earned income disregards, in order to convey the concept of "all applicants."

6. That fact undercuts defendants' argument that particular deference is due because the agency itself drafted the statutory provision. The discrepancy is unaccounted for, and tends to belie defendants' assertion that the statutory language is perfectly plain on its face.

    Defendants also rely heavily on a general principle of deference to agency interpretations of statutes. *See, e.g., Schweiker v. Hogan*, 457 U.S. 569, 588, 102 S.Ct. 2597, 2609, 73 L.Ed.2d 227 (1982). Deference is inappropriate, however, where the agency's approach is contrary to the letter or purpose of the law, which is the issue in this case. *E.g., Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Faught, supra,* slip op. at 12. Defendant's argument assumes what it purports to establish.

7. I also agree with the courts in *Vermeulen, supra,* slip op. at 21, and *Sweeney, supra,* 560 F.2d at 1124, that the reference to § 602(a)(7) in

the preamble to paragraph (8) does not somehow render § 602(a)(17) applicable to all AFDC recipients by some process of double incorporation. First, the lump sum statutory provision refers specifically to 8(A)(i) and (ii), not to the preamble. Second, the preamble does not even come close to specifying any group of applicants, or the whole class. Third, the preamble to paragraph (8) states only that the following subparagraphs apply "in making the [need] determination under paragraph (7) ...." A restrictive provision obviously must specify the general class that it is restricting. Such an interpretation, in addition to being tortuous, simply takes the preamble of paragraph (8) out of context and ignores the paragraphs following it, which are the only provisions explicitly incorporated by § 602(a)(17). Defendants quite properly do not press the argument in this case. Even the most favorable decisions to defendant's position did not use the "double incorporation" reasoning. *See decisions cited in n. 4, supra.*

8. Defendants quote this passage in support of their position, with the passage regarding "capability for maximum self-support and personal independence" underlined. Perhaps the point is considered self-evident. I fail to see how excluding destitute mothers and children from the welfare rolls and throwing them onto private charity enhances their independence or furthers the goal of self-support.

Pub.L. 97–35, § 2301, 95 Stat. 843, 845 (1981). I take judicial notice that OBRA was a budget-cutting measure. The goal of minimizing costs obviously competes with the remedial goals of the statute as a whole.

Defendant's simplest argument is that since OBRA is a budget-cutting measure, Congress must have intended the interpretation that would save the most money. *See Callejas, supra,* oral op. at 7; *Clark, supra,* slip op. at 9. I find the argument unconvincing. Both interpretations would save money.[9] The budgetary policy, taken in isolation, offers no aid in determining where Congress drew the line in balancing competing policies.

Defendant's second policy argument is similarly weighty, but also unhelpful in the balancing process. The lump sum rule, in effect an enforced budgeting scheme, supplanted the treatment of lump sum payments as current income. Congress noted that the old system had "the perverse effect of encouraging the family to spend such income as quickly as possible in order to retain AFDC eligibility." Report of the Committee on the Budget, S.Rep. No. 97–139, 97th Cong., 1st Sess. 505, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 771.

Viewed in isolation, that policy would support maximum applicability of the rule.[10] Balanced against the need to provide for needy children in families without earned income, it does not define any clear boundary. Nor does it explain why Congress worded the rule in terms of paragraphs 8(A)(i) and (ii).

Defendants argue that the construction urged by plaintiff unfairly penalizes recipients with earned income, *i.e.* the working poor. They argue that we should not attribute such a purpose to Congress. *See Faught, supra,* slip op. at 13 ("The Court cannot believe Congress would have intended such a result"); *Callejas, supra,* oral op. at 15–16. *See also Clark, supra,* slip op. at 8. I find evidence, however, that Congress had its reasons for distinguishing between recipients with earned income and others. Against that evidence, defendant's argument—which asks the court to speculate—cannot stand.

The only legislative history that addresses the issue of earned income supports plaintiff's reading of the statute. I find a Congressional purpose to reduce the number of recipients with earned income, and to confine AFDC to those without other sources of income.[11]

9. JoAnne Ross, federal defendant's Associate Commissioner for Family Assistance, offers the following in an affidavit:

(a) The Senate Report, and HHS, estimated in 1981 that the lump sum rule would save $5 million per year;

(b) From that estimate, and the fact that HHS estimated that only 7% of the AFDC caseload would have earned income. Ross deduces that plaintiff's interpretation would result in only a $300,000 saving. (I assume that Ross assumes that the original HHS estimate was based on applicability of the rule to all AFDC recipients. Thus, 7% of $5 million equals about $300,000. I get $350,000.)

(c) Ross then states that HHS, in preparing the $5 million estimate, assumed that approximately 13% of AFDC recipients would be affected by the rule. It assumed 54% federal matching, an ineligibility period of 6 months, and an average grant of $295/month.

(d) In 1979, before OBRA, about 14% of the AFDC caseload had earned income. In May 1981, just prior to OBRA, that figure declined to 11.6%. By May 1982, about 5.7% of the caseload had earned income.

The Ross affidavit does not contain figures for New Jersey, which would be most relevant to this lawsuit. Moreover, the estimates are obviously extremely rough, and rife with questionable assumptions. I take judicial notice, however, that the cost saving achieved by the lump sum rule would be greatly reduced under plaintiff's interpretation.

I do not give great weight to the affidavit's interpretation of the statute. I must review what Congress passed, not what HHS proposed.

10. The cases finding for the government relied heavily on the above-quoted passage to find the lump sum rule applicable to all recipients. *See Faught, supra,* slip op. at 12; *Clark, supra,* slip op. at 6–7; *Douthit, supra,* slip op. at 5 (finding for defendants on this issue but requiring hearing before any cutoff of aid). *See generally Callejas, supra.*

11. In any event, that has certainly been the effect of the OBRA amendments. The Ross affidavit, n. 9 *supra,* states that the percentage of AFDC recipients with earned income dropped from 11.6% in May 1981 to 5.7% in May 1982.

Congressman Latta, who sponsored the Gram-Latta amendment including the lump sum provision, argued:

> We can restore welfare under an income-support program for those with no other means of support rather than the massive income supplementation program it has become ....

127 Cong.Rec. H–3809 (June 26, 1981). Congress seems consciously to have restricted certain benefits to those with no other resources to fall back on. The *Sweeney* court speculated that a family with earned income has "demonstrated the ability to meet at least part of its basic needs ... [whereas] families with no other support or income who are terminated for months or even years will inevitably become destitute." 560 F.Supp. 1125. Whether or not that makes sense, the OBRA amendments do seem to distinguish between recipients with earned income and those without.[11a]

For example, § 2305 of OBRA amended 42 U.S.C. § 602(d)(1) to count as income any funds received as a result of the earned income advance. Section 2316 of OBRA terminated all working AFDC recipients with grants of less than $10.00, a measure that falls disproportionately upon working recipients. Section 2301 amended 42 U.S.C. § 602(a)(8) to limit child care deductions and work expenses for working recipients. It also reduced the work incentive income disregard from 12 months to 4 months per year.[12] Section 2303 of OBRA amended 42 U.S.C. § 602(a)(18) to terminate any person with gross income (*i.e.* prior to deductions) exceeding 150% of the standard of need. I conclude that we cannot rule out a Congressional intent to pass a measure that impacts more heavily on the working poor. *See Sweeney, supra,* 560

HHS in fact planned in advance for that state of affairs, although it predicted a figure closer to 7%.

Defendants have argued that Congress and HHS, having planned this state of affairs, could not have intended the small cash savings that would result from applying the lump sum rule only to recipients with earned income. The argument now seems to be that Congress and HHS intended to treat the two groups of recipients equally. That argument is difficult to credit; the drop in recipients with earned income is certainly no coincidence. Defendants will only with great difficulty reconcile their argument with such statements as: "[I]n 1981, HHS estimated that only 7% of the AFDC caseload would have earned income after the passage of OBRA ...." Ross affidavit, item 5. Clearly OBRA was intended to remove recipients with earned income from the rolls. Equal treatment of the two groups was not and is not part of the statutory purpose.

**11a.** Plaintiffs offer what is apparently the only legislative history directly on point. I do not regard it as controlling either way on the issue, but quote it here for the sake of completeness. The Senate Finance Committee Report, Section I, Summary of Finance Committee Recommendations, states:

> Count lump-sum payments—Under present law, any payments that meet the definition of income (e.g., retroactive social security benefits) are counted as income in the month of receipt and any of the payment that is not spent in that month is usually considered a resource in the months thereafter.
> *The committee amendment would require that large payments, together with other income remaining after the application of disregards, be considered available to meet ongoing needs* in the AFDC program. If such income exceeds the standard of need, the household would be ineligible for aid. Any amount of the income that exceeds the monthly needs standard would be divided by the monthly needs standard, and the household would be ineligible for aid for the number of months resulting from that calculation. Any remaining amount would be counted as income in the first month following the period of ineligibility.

S.Rep. No. 97–139, 97th Cong., 1st Sess., *reprinted in* 1981 U.S.Code Cong. & Ad.News 693, 702 (emphasis added).

The highlighted passage does mention disregards, which apply to households with earned income. The language may easily be interpreted as general and exemplary; it is inconsistent with an interpretation that would exclude those with earned income from operation of the rule, but such is not the claim here. The language may mean only that disregards, *if applicable,* should be applied before determining the amount of available income.

**12.** That provision had allowed working recipients to exclude the first $30 of earned income plus one third of the remainder, after deductions.

F.Supp. at 1125. *See generally Philadelphia Citizens in Action v. Schweiker,* 669 F.2d 877, 879 (3d Cir.1982).

Congress has the responsibility to allocate regrettably scarce resources. *Schweiker v. Wilson,* 450 U.S. 221, 238, 101 S.Ct. 1074, 1084, 67 L.Ed.2d 186 (1981). The lump sum rule was in fact intended to provide "a fair allocation of scarce resources among the most needy." 47 Fed. Reg. 5648 (Feb. 5, 1982) (promulgating the rule). The legislature targeted the "truly needy," a phrase in vogue at the time. It took the lack of alternative sources of income as its indicator of destitution. Whether the working poor should be penalized is not a question for this court. I find that 42 U.S.C. § 602(a)(17) (Supp. V 1981) applies only to AFDC recipients with earned income. The rules promulgated by defendants, 45 C.F.R. § 233.20(a)(3)(ii)(D) (1982) and N.J.A.C. 10:82–4.15(a) (adopted 14 N.J.Admin.Reg. § 1459(b) (Dec. 20, 1982)), are invalid as applied to plaintiffs.

## CONCLUSION

In light of the foregoing, plaintiffs' motion for summary judgment is granted; defendants' motion for summary judgment is denied; and plaintiffs' motion for a preliminary injunction need not be decided.