Marie BROGAN, Gladys Allison, Marge Hayes, Conley Fonda, Elizabeth Hansen, Paul Hansen, individually, and on behalf of all other persons similarly situated, Plaintiffs,

v.

Jeffrey MILLER, Director of the Illinois Department of Public Aid, and the Illinois Department of Public Aid, Defendants-Third Party Plaintiffs,

v.

Richard S. SCHWEIKER, Secretary, United States Department of Health and Human Services, Wayne A. Stanton, Regional Official, United States Department of Health and Human Services, Carolyne K. Davis, Administrator, Health Care Financing Administration, Martin D. Stanton, Regional Director, Medicaid, Third Party Defendants.

No. 81 C 6539.

United States District Court, N. D. Illinois, E. D.

March 17, 1982.

**140**

Phillip H. Snelling, Legal Assistance Foundation of Chicago, Wendy Meltzer, Mid-South Office, Legal Assistance Foundation, Chicago, Ill., for plaintiffs.

James O'Connell, Barbara Greenspan, Sp. Asst. Attys. Gen., Chicago, Ill., for defendants-third party plaintiffs.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

■ The plaintiff class of MA–NG (Medical Assistance—No Grant) recipients and applicants in Illinois[1] has moved for a preliminary injunction to prevent the defendants, Jeffrey Miller[2] and the Illinois Department of Public Aid ("IDPA"), from implementing a Medicaid eligibility rule which provides that those individuals whose income and resources exceed the state eligibility standard for cash assistance must actually incur medical expenses sufficient to bring their net income below the cash assistance standard calculated on a six-month basis before receiving a Medicaid card. Plaintiffs seek this Court to require IDPA to determine Medicaid eligibility on a one-month basis or to determine eligibility by allowing applicants to deduct six months' worth of anticipated medical expenses from the income they are currently required to anticipate over the same six-month period. Jurisdiction is alleged in this matter pursu-

1. Pursuant to Rule 23(a) and (b)(2), Fed.R. Civ.P., this Court certifies this action as a class action. The plaintiff class consists of all aged, blind, and disabled MA–NG applicants on or after September 1, 1981, and recipients on or after November 1, 1981, in Illinois, other than long-term care facility residents, who have been, are being, or will be required by defendants to incur medical expenses in the amount of six months' spend down in order to receive, and before receiving, MA–NG.

2. Jeffrey Miller is the Director of the Illinois Department of Public Aid.

ant to 28 U.S.C. §§ 1331 and 1343. For the reasons stated below, the Court will grant plaintiffs' motion for preliminary injunction and will order IDPA to determine Medicaid eligibility for aged, blind and disabled MA–NG recipients and applicants on a one-month basis.

The Court may in its discretion grant a motion for preliminary injunction relief when the moving party satisfies its burden of persuasion that (1) it will suffer irreparable harm in the absence of an injunction and that legal remedies are inadequate to prevent the harm, (2) the threat of harm to the movant outweighs the harm that would result to the opposing party if an injunction issues, (3) the moving party is at least reasonably likely to prevail on the merits, and (4) the public interest will not be disserved by the granting of injunctive relief. *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 48–49 (7th Cir. 1980); *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). Although no one of these factors is determinative, the movant's likelihood of success on the merits is often considered a "threshold requirement for entitlement to preliminary relief." *Kolz v. Board of Education of the City of Chicago*, 576 F.2d 747, 748–49 (7th Cir. 1978). Defendants in the present case challenge only the likelihood of plaintiffs' success on the merits; defendants do not dispute either the nature or extent of the harm plaintiffs will suffer if an injunction does not issue.

The plaintiff class in this case consists of aged, blind or disabled MA–NG (Medical Assistance—No Grant) recipients and applicants in Illinois. These individuals do not qualify for cash assistance because their income exceeds the income eligibility standard of Illinois law.[3] Income in excess of this standard is the amount which an applicant must "spend down" to become eligible for Medicaid. Prior to September 1, 1981, for new MA–NG applicants and November 1, 1981, for current MA–NG recipients,[4] an individual could satisfy this spend down requirement and thereby qualify for Medicaid immediately by contributing one-sixth of his or her total six-month spend down amount each month into a "collection account" established by IDPA. Under IDPA's new policy, an individual can satisfy this spend down requirement only by actually incurring medical expenses equaling or exceeding the total six-month spend down amount.[5]

There is no dispute that such a policy imposes a real and immediate hardship for members of the plaintiff class. The hardship arises from the requirement that a MA–NG applicant must anticipate six months' worth of income to calculate his or her spend down obligation but is not permitted to anticipate six months' worth of medical expenses to offset that income. A MA–NG applicant who has only one month of income, for example, will be required to incur medical expenses to offset six months' worth of "excess" income before qualifying for Medicaid benefits. Under such a policy, individuals in plaintiffs' class will be presented with a "Hobson's choice" of delaying needed medical care in order to pay for other necessities as reflected in the state income eligibility standard or delaying the purchase of those necessities in order to pay

---

**3.** The income eligibility standard in Illinois is $1,428 for six months ($238 per month) for a single aged, blind or disabled person and $1,998 for six months ($333 per month) for a couple.

**4.** More specifically, the challenged provisions of IDPA's policy were to be phased in for current recipients from November 1, 1981, to February 1, 1982.

**5.** The spend down amount which must be incurred before the applicant is eligible for Medicaid is calculated by anticipating the applicant's countable income over a six-month period [less $25.00 per month ($150.00 total) in income disregards] and deducting from that figure the amount the state determines is needed to purchase the necessities of life over that same period ($238.00 per month, or $1,428.00 over a six-month period). Thus, an applicant with countable income of $350 per month would calculate his or her spend down amount as follows:

| | |
|---|---|
| Countable Income over 6 Months ($350.00 x 6) | $2,100.00 |
| LESS: 6 Month Income Disregard ($25.00 x 6) | (150.00) |
| Total | 1,950.00 |
| MA–NG Income Eligibility Standard ($238.00 x 6) | (1,428.00) |
| Spend Down Amount | $ 522.00 |

for medical care and subsequently qualify for Medicaid.[6]

In light of these rather stark consequences, we find that, absent granting relief, plaintiff class will suffer irreparable harm, that legal remedies are inadequate, that the threatened harm to the plaintiff class outweighs any harm to defendants should an injunction issue, and that the public interest will not be disserved by the granting of injunctive relief. Thus, the only issue remaining for this Court to decide is whether the plaintiff class is reasonably likely to prevail on the merits of this lawsuit. The substance of plaintiffs' claim in this context is that IDPA's new spend down policy violates the provisions of the Medicaid statute governing state administration of the medical assistance program. Because one of those provisions is tied to the eligibility criteria used by Illinois in 1972, it is necessary to trace the history of the Medicaid program in Illinois in some detail.

The Medicaid program, established in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., "provid[es] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). States choosing to participate in the plan must comply with the requirements of Title XIX and regulations promulgated by the Secretary of Health and Human Services ("HHS"). Schweiker v. Gray Panthers, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981); 42 U.S.C. § 1396a (1981 Supp.). One of those requirements is that the "categorically needy," recipients of cash payments under state-administered categorical welfare plans, must also be eligible to receive Medicaid benefits under the applicable state medical assistance plan. 42 U.S.C. § 1396a (1976) as amended by Omnibus Budget Reconciliation Act of 1981, Pub.L.No.97–35. Until 1972, this meant that all recipients of Old Age Assistance ("OAA"), Aid to Families with Dependent Children ("AFDC"), Aid to the Blind ("AB") and Aid to the Permanently and Totally Disabled ("APTD") were automatically eligible for Medicaid. In 1972, however, Congress replaced all but AFDC with the federally-administered Supplemental Security Income ("SSI") program for the aged, blind and disabled. 42 U.S.C. § 1381 et seq.[7] Under this program, AFDC recipients retain their automatic eligibility for Medicaid as categorical assistance recipients. In states like Illinois, however, aged, blind and disabled recipients of SSI automatically qualify for Medicaid only if they would have qualified for cash assistance under the former state categorical assistance programs in effect on January 1, 1972. 42 U.S.C. § 1396a(f).[8]

---

**6.** The human cost of such a policy can be measured from the experience of Gladys Allison, a seventy-three year old MA–NG recipient who suffers from chronic Lupus Erythematosus. Although Ms. Allison has available monthly income of only $312.20, IDPA's new policy will deny her Medicaid benefits until she has incurred medical expenses totalling $295.20. In light of her present condition, her foreseeable medical expenses will total at least $175.00 per month. If she chooses to obtain all the medical care she requires, Ms. Allison will incur medical expenses totalling $175.00 in the first month and at least $120.20 in the second month before qualifying for Medicaid. Because of her precarious financial condition, Ms. Allison cannot obtain such medical care on credit. Accordingly, she will have only $137.20 left over to meet her living expenses in the first month and $192.00 in the second month. The State of Illinois has determined that at least $238 is needed each month to pay for the necessities of life (excluding medical care).

Alternatively, if Ms. Allison chooses to obtain the necessities of life as defined by the state, she will have only $74.20 left over to pay for needed medical care in the first month this policy takes effect. This amount represents less than half of the total care she requires. This result is unconscionable. Lupus Erythematosus is a chronic disease which can be fatal unless the patient is carefully treated and monitored. Affidavit of Dr. Jerome Frankel, ¶ 3.

**7.** The SSI program took effect on January 1, 1974.

**8.** This limitation was deemed necessary because SSI eligibility standards were more liberal than their predecessors in state categorical programs. Fearing that some states would get out of Medicaid altogether if they were required to provide medical benefits to SSI recipi-

Those aged, blind and disabled individuals whose income is too great to have qualified for categorical assistance under the state standards in effect in 1972 are required by Title XIX to "spend down" their excess income before they can qualify for Medicaid. 42 U.S.C. § 1396a(f). These are the MA–NG applicants and recipients comprising the plaintiff class in this case. Many of these individuals are recipients of SSI whose level of benefits exceed the income eligibility standard for categorical assistance. Other members of the plaintiff class do not receive SSI benefits. Their "excess" income comes from other sources. In either event, however, Title XIX provides that such individuals must be eligible for Medicaid if their income, after deducting incurred medical expenses, "is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972." [9]  42 U.S.C. § 1396a(f) (1976).

Although no longer receiving state categorical assistance, aged, blind and disabled SSI recipients in Illinois are "categorically needy" within the meaning of Title XIX whether their income falls above or below the cash assistance income eligibility standard. Those MA–NG applicants who have incomes above the income eligibility standard but do not receive SSI benefits (or state supplemental payments) are "medically needy." [10]  See 42 C.F.R. § 435.4 (1981). In a state like Illinois, therefore, some of the categorically needy as well as all of the medically needy are required to spend down

---

ents who would not have qualified under the former categorical programs, S.Rep.No.553, 93d Cong., 1st Sess., 56 (1973), Congress created the "209(b) option" which provides in pertinent part:

> Notwithstanding any other provision of this subchapter, except as provided in subsection (e) of this section, no State not eligible to participate in the State plan program established under subchapter XVI of this chapter shall be required to provide medical assistance to any aged, blind, or disabled individual (within the meaning of subchapter XVI of this chapter) for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month, except that for this purpose any such individual shall be deemed eligible for medical assistance under such State plan if (in addition to meeting such other requirements as are or may be imposed under the State plan) the income of any such individual as determined in accordance with section 1396b(f) of this title (after deducting any supplemental security income payment and State supplementary payment made with respect to such individual, and incurred expenses for medical care as recognized under State law) is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972. 42 U.S.C. § 1396a(f) (1976). Fourteen states other than Illinois now operate under the 209(b) option. *Schweiker, supra* at n.6. The remaining states provide Medicaid benefits to all SSI recipients.

**9.** Thus, individuals who were not categorically needy under state cash assistance programs prior to 1972 are now considered categorically

needy as long as they are receiving SSI benefits or state supplements. This result is dictated by 42 U.S.C. § 1396a(f) which provides in pertinent part:

> In States which provide medical assistance to individuals [who would not have qualified for cash assistance under state categorical programs,] an individual who is eligible for medical assistance by reason of the requirements of this section concerning the deduction of incurred medical expenses from income shall be considered [categorically needy] if that individual is, or is eligible to be (1) an individual with respect to whom there is payable a State supplementary payment on the basis of which similarly situated individuals are eligible to receive medical assistance equal in amount, duration, and scope to that provided to individuals eligible under clause (10)(A), or (2) an eligible individual or eligible spouse, as defined in subchapter XVI of this chapter, with respect to whom supplemental security income benefits are payable; otherwise that individual shall be considered to be an individual eligible for medical assistance under clause (10)(C) of that subsection.

*See also* Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Exhibit 8 (Attachment to Letter from HHS to IDPA), pp. 2–3.

**10.** Those individuals whose excess income does not come from SSI or state supplemental payments are considered "medically needy." 42 U.S.C. § 1396a(a)(10)(A) (1976) *as amended*, P.L. 97–35 (1981). By definition, all of the medically needy are required to spend down in order to qualify for Medicaid. Illinois had a medically needy medical assistance program in effect in 1972.

part of their income in order to qualify for Medicaid.

However byzantine this statutory scheme may appear, the fact that some members of the plaintiff class are categorically needy and others medically needy has more than semantic significance. By definition, the state categorical assistance program in effect in 1972 did not provide for a Medicaid spend down or collection account for the categorically needy. Since 1972, however, some categorically needy individuals must spend down in order to qualify for Medicaid. It is not immediately apparent, therefore, how the 1972 Illinois categorical assistance program can provide the standard through which SSI MA–NG applicants can gain Medicaid eligibility as Title XIX requires.

This apparent anomaly does not require, as defendants suggest, that we somehow borrow the spend down eligibility criteria for the categorically needy from the narrower 1972 medical assistance program for the medically needy in Illinois.[11] The absence of a spend down provision in the 1972 state categorical assistance program simply requires that IDPA calculate the income of categorically needy applicants under SSI for Medicaid purposes by disregarding the income spent down for medical care. As the language of 42 U.S.C. § 1396a(f) suggests, incurred medical expenses is simply an additional factor to be taken into account by IDPA in the income calculation for categorically needy applicants. Neither the income eligibility level itself nor the period over which income is calculated should change from those standards utilized in 1972.[12]

From a practical standpoint, eligibility for categorical assistance in Illinois in 1972 appears to have been calculated on a monthly basis.[13] Earned income and other resources available to a categorical assistance applicant were calculated on a monthly basis. See IDPA Manual for Aid to the Aged, Blind and Disabled ("AABD") §§ 1065.2, 1250 (Appendices VI and VII) (effective on January 1, 1972). "In determining earned income to be taken into account" when measuring an applicant's need, Illinois law expressly provided for monthly income disregards the size of which depended upon the aged, blind or disabled status of the applicant. Ill.Rev.Stat.1971, ch. 23, § 3–1.2. The need of an applicant and the size of his or her cash payment was determined with reference to a monthly budget prepared by IDPA. IDPA AABD Manual, § 1002. Under these circumstances, there can be little doubt that "budgeting methodologies actually amount to eligibility rules." *Calkins v. Blum*, 511 F.Supp. 1073, 1093 (N.D.N.Y.1981).

**11.** It is, of course, not surprising that IDPA urges us to juxtapose these two programs in this way. The medically needy program in effect in 1972, in contrast to the categorical assistance program, *infra*, utilized a six-month eligibility period for medical assistance. Under IDPA's new policy, therefore, some of the new categorically needy under SSI would gain Medicaid eligibility several months after they would have been eligible for Medicaid had they fit into the traditional categorically needy mold.

**12.** Accordingly, the spend down requirement does not have a life of its own. It must be calculated over the same period that income eligibility was calculated under the categorical assistance program in effect in 1972. Calculating the spend down requirement over a six-month period would render the 1972 income eligibility standards for categorical assistance meaningless. Contrary to defendants' suggestion, neither Title XIX nor its implementing regulations support the proposition that IDPA can "pick and choose from various Medicaid eligibility requirements." Def. Mem. in Opposition to Preliminary Injunction, p. 12. It is, of course, true that IDPA can pick and choose from the SSI eligibility requirements, 42 C.F.R. 435.121(a)(c) (1981); this flexibility is the reason why Illinois chose to become a "209(b)" state. IDPA cannot, however, impose an income eligibility requirement which is more restrictive than the state plan in effect in 1972. 42 C.F.R. 435.121(b) (1981).

**13.** Defendants' argument that eligibility redeterminations were made on a twelve-month basis, Affidavit of Randale R. Valenti, ¶ 5, is not relevant to the factual issue concerning how initial eligibility determinations were made for categorical assistance applicants. Indeed, defendants have not presented any specific evidence contravening plaintiffs' allegation that eligibility was effectively determined on a monthly basis in 1972.

Because the income and resources of a categorical assistance applicant were determined on a monthly basis for eligibility purposes in Illinois in 1972, the spend down deduction from that income must also be determined on a monthly basis in order to preserve the integrity of the January 1, 1972, eligibility standards for the categorically needy. Any other result would allow IDPA to treat the SSI categorically needy population differently than the traditional categorically needy population in violation of 42 U.S.C. § 1396a(a)(10)(B)(i) (1976) *as amended* by P.L. 97–35 (1981). Thus, pursuant to 42 U.S.C. § 1396a(f) (1976), aged, blind and disabled MA–NG applicants and recipients who are categorically needy (because of their eligibility for or receipt of SSI or state supplemental payments) must be permitted to spend down on a one-month rather than six-month basis.

This Court's determination of IDPA's responsibility toward categorically needy MA–NG applicants and recipients has the effect of resolving the issue of IDPA's responsibility toward medically needy MA–NG applicants and recipients. It is true that MA–NG income eligibility for the medically needy in Illinois was calculated on a six-month basis in 1972. IDPA AABD Manual § 5011.1 (effective on January 1, 1972). It is also true, however, that the 1972 "standards for medical assistance" defining the point below which all MA–NG applicants cannot be required to spend down "is considered to be the eligibility standard for cash assistance, or the medical assistance standard for the medically needy program (if the State has established one), *whichever is higher.*" S.Rep.No.92–1230, 92d Cong., 2d Sess. 222 (emphasis added) U.S.Code Cong. & Admin.News 1972, p. 4989. *See also Hayes v. Stanton*, 512 F.2d 133, 137 n.5 (7th Cir. 1975). Given the restrictive effect on eligibility of a six-month spend down requirement, the "higher standard governing treatment of the

medically as well as categorically needy under 42 U.S.C. § 1396a(f) must be derived from the cash assistance program in effect in 1972. Because that program determined eligibility based on monthly income standards, *supra*, the spend down requirement for the medically needy must also be calculated on a monthly basis.

■ Calculating the income of medically needy MA–NG applicants in the same way as categorically needy applicants is consistent with the basic purpose of the Medicaid program. Since passage of SSI in 1972, many categorically needy MA–NG applicants have as great a need for Medicaid as medically needy applicants. Distinguishing between these two groups for Medicaid eligibility solely because of the source (as opposed to the amount) of their income would violate the spirit, if not the letter, of Title XIX. Indeed, Title XIX itself provides that the standards for calculating Medicaid eligibility must be comparable between the medically needy population and the categorically needy population.[14] 42 U.S.C. §§ 1396a(a)(2), (10)(C) *as amended* Pub.L. 97–35 (1981). *See also Hodecker v. Blum*, 525 F.Supp. 867, 873 (N.D.N.Y.1981); *Winter v. Quern*, 490 F.Supp. 788, 794 (N.D.Ill. 1980). As Congress concluded at the inception of the Medicaid program, "[i]n no event . . . may a State require the use of income or resources which would bring the individual's income below the amount established as the test of eligibility under the State plan. Such action would reduce the individual below the level determined by the State as necessary for his maintenance." S.Rep. No.404, U.S.Code Cong. & Admin.News, pp. 1943, 2019 (1965).

■ Title XIX also requires that a state Medicaid plan

include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of

---

**14.** Although one of the "comparability" sections of Title XIX was amended in the Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35, it is clear that Congress intended that comparability between the categorically and medically needy continue. House Conf.Rep.No.77–208, 97th Cong., 1st Sess. 1971 (1981). *See also Hodecker v. Blum*, 525 F.Supp. 867, 873 (N.D.N.Y.1981).

this subchapter, [and] (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient. . . .

42 U.S.C. § 1396a(a)(17) (1981). An eligibility policy like the one at issue here which requires the expenditure of income not yet received by the categorically and medically needy cannot be described as reasonable or consistent with the objectives of Medicaid.[15]

Complicating this dispute between IDPA members of the plaintiff class is IDPA's allegation that HHS mandated implementation of the six-month spend down requirement in Illinois. This allegation, apparently an attempt to shift responsibility for IDPA's new spend down policy onto HHS,[16] is not quite accurate. Patricia Richter, Supervisor of the Bureau of Program Operations in the Health Care Finance Administration of HHS, testified that IDPA was not required by HHS to implement a six-month spend down requirement. Deposition of P. Richter at 31–32. Indeed, all of the documents presented by defendants detailing the history of IDPA's dealings with HEW and HHS since 1975 suggest that the federal government has required Illinois to abandon its "collection account" system; HHS has not specifically required IDPA to implement a six-month spend down requirement.[17]

The Court is cognizant of the fact that HHS has "approved" IDPA's corrective action plan including the six-month spend down requirement. See Letters from Tera Younger, Director of Program Operations, HCFA, HHS, Dated August 20, 1981, and December 11, 1981. This approval, primarily based on HHS' conclusion that the plan eliminates the cause of the abuses under the old collection account system, does not constitute a specific endorsement of the legal sufficiency of a six-month spend down requirement as it compares with Illinois categorical assistance standards in effect in 1972. The general approval by HHS of IDPA's corrective action plan "is not more than slightly persuasive when, as here, the so-called approval does not appear to have followed explicit attention to the question presented." See Aitchison v. Berger, 404 F.Supp. 1137, 1148 (S.D.N.Y.1975), aff'd 538 F.2d 307, cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

Accordingly, this Court will grant plaintiffs' motion for a preliminary injunction

---

**15.** This conclusion is not inconsistent with 42 C.F.R. § 435.831 (1981) which provides that "[t]he [State Medicaid] agency must use a prospective period of not more than 6 months to compute income." If an agency is free to and chooses to compute income on a prospective six-month basis, that agency can act "reasonably" within the meaning of Title XIX if it computes expenses on that same prospective or anticipated basis. Otherwise, the calculation of how much income or resources are "available to the applicant or recipient" is meaningless. Thus, we do not intend by this opinion to invalidate 42 C.F.R. § 435.831 (1981). In any event, because of the status of Illinois categorical assistance programs in 1972, Illinois is tied to a one-month eligibility period for the medically and categorically needy.

**16.** Subsequent to the filing of plaintiffs' motion for a preliminary injunction, IDPA filed a third party complaint against HHS asserting that if this Court grants a preliminary injunction, that order must also be binding on HHS. Because this Court's disposition of the preliminary injunction in effect orders IDPA to comply with Title XIX, we expect that the issue of HHS' compliance is academic. Thus, this Court will not decide the issue of HHS' compliance pending HHS' response to IDPA's third party complaint.

**17.** From HEW and HHS' perspective, the problem with Illinois' prior "collection account" system (under which recipients were supposed to pay ⅙ of six months' worth of excess income into an account established by IDPA each month) stemmed from IDPA's practice of billing the federal government for medical services received which should have been paid out of collection account funds. See HEW Audit, December 23, 1975, pp. 3–6, 54–57. This occurred largely because IDPA was unsuccessful in compelling recipients to pay into their collection account. See Letter from George Holland, Regional Administrator of HHS to Jeffrey Miller, Director of IDPA, September 30, 1980. In light of this history, it seems clear that HHS required IDPA to abandon the collection account system in favor of a spend down requirement, not that HHS required IDPA to implement a six-month spend down requirement.

and will order IDPA to impose a spend down requirement calculated on a one-month basis for all aged, blind and disabled MA–NG applicants and recipients.[18] Defendants are directed to determine MA–NG eligibility for the plaintiff class by utilizing a one-month spend down requirement. It is so ordered.

18. This disposition obviates the need to consider whether IDPA must anticipate medical expenses or whether 42 U.S.C. § 1396a(a)(34) or 42 C.F.R. § 435.914(a) (1981) further mandates a spend down period less than six months.