608 F.Supp. 1324 (1984)
Sam COHEN, by his next friend Sidney COHEN, on Behalf of himself and all others similarly situated, Plaintiffs,
v.
Arthur F. QUERN, individually and as Director of the Illinois Department of Public Aid, Patrick Kain, individually and as administrator of the Medical Assistance Program, Illinois Dept. of Public Aid, and Illinois Department of Public Aid, Defendants.
No. 79 C 2447.
United States District Court, N.D. Illinois, E.D.
December 20, 1984.
*1325 Nelson A. Soltman, Wendy Meltzer, Legal Assistance Foundation, Chicago, Ill., for plaintiffs.
Barbara L. Greenspan, William J. Scott, Thomas O'Laughlin, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER
GETZENDANNER, District Judge:
This class action, filed under 42 U.S.C. § 1983, the Declaratory Judgment Act, and Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396p, seeks to challenge certain policies of the Illinois Department of Public Aid (IDPA) as violating Title XIX and regulations issued pursuant thereto. The plaintiff class consists of two groups: 1) all medically needy families with dependent children and all medically needy aged, blind, and disabled residents of group care facilities who are eligible for IDPA assistance under Title XIX[1]; and 2) all eligible applicants for Medicaid in Illinois whose applications have been or are approved on or after June 10, 1979, and who have either paid for (or have had paid for on their behalf) necessary medical care and services in the three-month period prior to their IDPA applications. The matter is currently before the court on the motion of plaintiffs for summary judgment as to Count II of the complaint. This count represents all the issues still pending before the court. For the reasons stated below, the plaintiffs' motion is granted.

Medicaid: A Brief Overview
In 1965, Congress enacted Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396p (Medicaid), to provide federal subsidies to states financing medical assistance to indigent families with dependent children, and to blind, disabled, or elderly individuals. Under the Medicaid program two basic groups were eligible for Medicaid assistance. The first, termed the "categorically needy," consisted of persons who also received cash assistance from one of several state-federal cooperative programs: Old Age Assistance, 42 U.S.C. §§ 301-306 (repealed 1974); Aid to Families with Dependent Children (AFDC), 42 U.S.C. §§ 601-615; Aid to the Blind, 42 U.S.C. §§ 1201-1206 (repealed 1974); and Aid to the Permanently and Totally Disabled, 42 U.S.C. §§ 1351-1355 (repealed 1974). See 42 U.S.C. § 1396a(a)(10)(A)(i). In Illinois, the categorically needy were (and are) classified into two groups: AFDC recipients, and Aid to the Aged, Blind and Disabled (AABD) recipients. See Ill.Rev.Stat. ch. 23, § 3-1 (1982). Under Title XIX, all participating states were required to provide benefits to the categorically needy. See generally Winter v. Miller, 676 F.2d 276, 277 (7th Cir.1982).
The second group, termed the "medically needy," 42 C.F.R. § 435.800, consisted of persons with large medical expenses who met the non-financial requirements for cash assistance (e.g., were aged, blind, or disabled), but who had incomes higher than the maximum eligibility levels for those programs. 42 U.S.C. § 1396d(a). Persons in the medically needy group became eligible for Medicaid by incurring medical expenses equal to the amount by which their total income exceeded the income of those who receive cash welfare assistance. Thus, these persons were required to "spend-down" this excess amount in order to qualify for medical assistance. Providing relief to the medically needy was optional *1326 under the 1965 Medicaid program. See Winter, 676 F.2d at 277.
In 1972, Congress amended the Social Security Act to shift some of the financial burden of the categorical assistance programs from the states to the federal government, and enacted the Supplemental Security Income Program, 42 U.S.C. § 1381-1383c (SSI). Under the SSI amendments, which went into effect on January 1, 1974, the aged, blind, and disabled eligible for welfare assistance began to receive cash grants through the federal SSI program rather than from their individual states. The 1972 amendments also raised benefits and eased eligibility criteria under these programs to allow more people to receive general welfare assistance. However, because eligibility for Medicaid was tied to general welfare eligibility, these amendments "threatened to swell the Medicaid rolls and place a large and immediate fiscal burden on participating states." Winter, 676 F.2d at 278.
Fearful that the higher federal limit governing Medicaid eligibility might cause participating states to abandon the program, Congress enacted § 209(b) of the Act, 42 U.S.C. § 1396a(f), which allowed states the option of limiting Medicaid assistance to those aged, blind, or disabled individuals who would have qualified under the income ceilings in effect on January 1, 1972. States which elect this option, however, are required to provide medical assistance for the medically needy and to incorporate a "spend-down" provision for determining eligibility levels. 42 U.S.C. § 1396a(f). The spend-down ensures that those individuals who would otherwise be eligible under the higher federal limits are allowed to deduct their incurred medical expenses from their income before the state can determine whether 1972 eligibility levels were met. Illinois, along with fifteen other states, elected the 209(b) option. See Schweiker v. Gray Panthers, 453 U.S. 34, 39 n. 6, 101 S.Ct. 2633, 2638 n. 6, 69 L.Ed.2d 460 (1981).

Statement of the Case
The Illinois Department of Public Aid (IDPA), as the state agency responsible for administering the Medicaid program in Illinois, Ill.Rev.Stat., ch. 127, § 48a (1982), is required to follow a plan consistent with the requirements of Title XIX and the regulations promulgated thereunder by the Secretary of Health and Human Services (HHS). Brogan v. Miller, 537 F.Supp. 139, 142 (N.D.Ill.1982). Plaintiffs challenge three aspects of the IDPA's current plan with regard to IDPA's definition of "incurred" expenses. First, plaintiffs contend that the IDPA is required by federal law to credit against spend-down all medical expenses for which a Medicaid applicant remains currently liable. Second, plaintiffs contend that IDPA violates federal law by refusing to credit against spend-down incurred medical bills which have been paid by a third party who is not legally responsible for the bills. Finally, plaintiffs contend that IDPA must establish a procedure for making refunds to participating health care providers who have been paid for services which are found to be retroactively covered by Medicaid. These claims will be discussed in turn.

1. Whether IDPA must credit against spend-down all incurred medical expenses for which applicants are currently liable.

IDPA has implemented the spend-down requirement with respect to the aged, blind, and disabled nursing home residents and the AFDC-related medically needy in this case by creating a one month "established period" over which income is compared to the appropriate Medical Assistance-No Grant (MA-NG) standard. AABD Manual, PO-620(3); AFDC Manual, PO-620(3) (Plaintiffs' Exhibits 8 & 3).[2] Under the IDPA's regulations, if the expenses concern services provided during the one-month period, they may be credited against spend-down. AABD Manual at PO-620(4); *1327 AFDC at PO-620(3). If, however, the expenses concern services provided before the one-month period, only "actual payments made during the current period" may be credited. AABD Manual at PO-620(17) (Plaintiffs' Exhibit 9); AFDC Manual at PO-620.5. As a result, individuals who do not receive a bill until more than a month after the services are provided may not use that bill to establish Medicaid eligibility unless they pay it first.
Plaintiffs challenge this result as violating 42 C.F.R. ¶ 435.732(c)(1)[3], which requires state agencies to credit towards spend-down all "expenses incurred by the individual or financially responsible relatives for necessary medical and remedial services," and 42 U.S.C. § 1396a(a)(17)(D), which requires state plans to "tak[e] into account, except to the extent prescribed by the Secretary, the costs ... incurred for medical care or for any other type of remedial care recognized under state law." As plaintiffs note, neither the statute nor the implementing federal regulations state any limit on the age of bills which may be credited towards spend-down, and speak in terms of "incurred" expenses rather than "paid" bills. Since "incurred" generally is defined as "becom[ing] liable or subject to," Gadway v. Blum, 567 F.Supp. 772, 775 (N.D.N.Y.1983) (citing Webster's Third New Int'l Dictionary at 1146), plaintiffs argue that the statute implicitly requires § 209(b) states to credit against spend-down all medical expenses for which the applicant is currently liable, and does not give the states any discretion to impose an age limitation on those expenses in determining Medicaid eligibility.
To support their construction, plaintiffs note that the HHS interpretive guidelines support its position:
[W]hile the state cannot arbitrarily exclude unpaid bills incurred prior to the initial eligibility period (for which the applicant may, in fact, remain liable) a cut off period could be established for identifying old bills subject to intensive scrutiny.
HCFA Regional Office Manual, Part 6, Medicaid Guidelines, Transmittal No. 31 (June 19, 1979), reported in 1980 Transfer Binder (CCH), Medicare and Medicaid Guide ¶ 30,392, § 2400, Question 3. Additionally, in 1978 the HHS Regional Administrator wrote to IDPA Director Arthur Quern and affirmed its position: "A limit on the age of unpaid bills may not be placed. Current policy requires that bills which are the current liability of the applicant must be counted toward the spend-down liability." (Plaintiffs' Exhibit 12). This view was reiterated as recently as September, 1983, when HHS proposed regulatory reforms to allow states to exclude from incurred medical expenses those bills for services provided more than three months prior to a Medicaid application: "[A]ny bills incurred prior to the period for which eligibility is determined, may be applied to the spend-down period only if they are unpaid, and remain a current obigation of the individual." 48 Fed.Reg. 39959, 39961 (Sept. 2, 1983).[4]
Finally, the plaintiffs note that this very same issue was decided by another judge in this district in favor of aged, blind, and disabled MA-NG applicants who are not in long-term care facilities. Brogan v. Miller, 81 C 6539 (Unpublished Order issued July 7, 1983). In that case, Judge Marvin E. Aspen adopted the Report and Recommendations of Magistrate Jurco, which concluded that "Eligibility exists when the medical expenses are incurred, not paid.... Unpaid *1328 medical expenses incurred cannot be conditioned on payment in order to be carried over to the next eligibility period." Report at 4.
Because HHS is the administrative agency charged with executing Title XIX, its interpretation of its own regulations is, of course, entitled to "great weight," Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and its construction of the statute to be followed "unless there are compelling indications that it is wrong." New York State Department of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973). Such deference is particularly appropriate with regard to Title XIX, since, as the Supreme Court has stated, "Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the Act." Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981).
In the present case, IDPA has argued that HHS's position is inconsistent with the purposes behind the spend-down requirement, namely, to provide Medicaid for those applicants whose present available income is insufficient to meet present medical expenses. According to IDPA, the mere existence of a past medical bill may not have any effect on a client's present income absent proof that it remains a current obligation of the individual. Because only a payment on the past bill ensures that present available income is actually reduced because of the past bill, IDPA argues that its spend-down policy is a permissible means of insuring that no IDPA applicant has more money available to him than is allowed under the state formula.
In further support of this position, IDPA notes that HHS has approved the state plan under attack in this case, thus in effect determining that the plan complies with applicable statutory and regulatory requirements, which determination should be accorded substantial deference. See Michael Reese Physicians & Surgeons, S.C. v. Quern, 606 F.2d 732, 735-36, aff'd en banc, 625 F.2d 764 (7th Cir.1980), cert. denied 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981). IDPA also argues that the decision in Brogan is inapposite since the amendments to Title XIX passed in the Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub.L. No. 97-35, explicitly provide the states with "flexibility in establishing eligibility criteria ... to address the needs of different population groups more appropriately." H.R.Rep. No. 97-208, 97th Cong., 1st Sess. 971, reprinted in [1981] U.S.Code Cong. & Ad.News 1010, 1333.
On balance, the court finds that the interpretation of "incurred expenses" suggested by the plaintiffs and adopted by HHS is consistent with both common sense and the statutory goals of Title XIX, and that IDPA's objections provide no "compelling indications" to suggest that HHS has misinterpreted its own regulations. See Dublino, 413 U.S. at 421, 93 S.Ct. at 2516. IDPA's argument that payment is necessary if plaintiffs are to prove that they remain currently liable for old bills in effect conditions crediting of old bills on payment, whereas the statute conditions Medicaid coverage on currency of the debt and not actual reduction of income.
Second, IDPA's assertion that HHS has approved its plan is overstated. The plan which HHS approved nowhere refers to IDPA's interpretation of "incurred expenses" but instead concerns itself with general eligibility requirements and income levels. (Plaintiffs' Exhibit 28). Therefore, IDPA's position is not entitled to special deference.
Finally, IDPA's attack on the dispositiveness of Brogan is misconceived. Brogan is relevant to this case not because institutionalized and non-institutionalized AABD recipients must be treated identically, but because Judge Aspen in that case decided the same issue of statutory construction now before this court. Even assuming that IDPA could show that differential treatment to institutionalized MA-NG recipients allows it to address their needs more appropriately, Brogan would still be persuasive as an interpretation of statutory *1329 requirements which apply to both institutionalized and non-institutionalized AABD recipients.

2. Whether IDPA must credit against spend-down medical bills paid for by a third-party not legally obliged to compensate the party who incurred the bills.

IDPA's obligation to deduct incurred medical expenses against countable income is limited by the provision that bills "subject to payment by a third party" need not be credited toward spend-down. 42 C.F.R. § 435.732(c)(i). This regulatory proviso implements 42 U.S.C. § 1396a(a)(25), which requires the state to treat "the legal liability of third parties to pay for care and services ... as a resource of the individual on whose behalf the care and services are made." Accordingly, HHS regulations define a third party as "any individual, entity or program that is or may be liable to pay all or part of the medical cost of injury, disease, or disability of an applicant or recipient." 42 C.F.R. § 433.136(3).
Under IDPA's current plan, all medical bills for services performed within the established period are excluded from consideration of the spend-down amount if paid for by a non-liable third party:
Payment on a spend-down client's medical care costs by a person not included in the income standard [i.e., not spouses or children] ... is considered similar to a TPL [third party liability] payment. The portion of the client's medical care costs paid by the person ... is not considered towards the client's spend-down obligation. Only the part, if any, not paid, remains as the client's obligation and may be considered towards meeting spend-down.
IDPA, AABD and AFDC Manuals § PO-620.5.c.3(c) (Plaintiffs' Exhibits 17 & 18). IDPA has thus interpreted 42 C.F.R. § 435.732(c)(i) as incorporating not only bills for which a third party is legally liable but also those which a third party has voluntarily chosen to pay.
Plaintiffs note that this policy has particularly harsh consequences. Medicaid applicants who cannot receive medication and other supplies on credit and who have otherwise spent down to the 1972 income levels will often turn to non-responsible family members or friends to help them out while the IDPA processes their applications. That these third parties extend resources, however, does not mean that they do not want or expect to be repaid. IDPA policy, by denying credit for incurred medical bills which are paid by someone else, makes it impossible for Medicaid applicants to repay these debts except by living on even less than their protected income level.
Plaintiffs challenge this result on two grounds. First, plaintiffs claim that IDPA's policy violates 42 U.S.C. § 1396a(a)(17)(D), which forbids state Medicaid agencies to "take into account the financial responsibility of any individual for any applicant or recipient of assistance ... unless such applicant or recipient is such individual's spouse or is such individual's child who is under age 21 or ... is blind or disabled...." Although IDPA's policy relates to the definition of "incurred medical expenses" which must be counted against spend-down, and not to the definition of available income addressed in § 1396a(a)(17)(D), plaintiffs appear to argue that IDPA's policy nonetheless violates the statute by effectively taking these third-party payments into account in computing an applicant's benefits level.
Even assuming this latter assertion to be correct, the court seriously doubts whether IDPA's policy violates § 1396a(a)(17)(D). That section addresses the impropriety of presuming support from non-immediate family members, but does not, at least facially, prevent the states from considering actual payments made by those third parties. The legislative history on this point is instructive:
States may not include in their plans provisions for requiring contributions from relatives other than a spouse or the parent of a minor child or children over 21 who are blind or permanently and *1330 totally disabled. Any contributions actually made by relatives or friends, or from other sources, will be taken into account by the State in determining whether the individual applying for medical assistance is, in fact in need of such assistance.
S.Rep. No. 404, 89th Cong., 1st Sess. 78 (1965), reprinted in [1965] U.S.Code Cong. & Ad.News, 1943, 2018. See also Schweiker v. Gray Panthers, 453 U.S. 34, 45, 101 S.Ct. 2633, 2641, 69 L.Ed.2d 460 (1981) (same).
The court finds it unnecessary to decide whether the relieving of debts at issue here may properly be treated as income to the parties benefited, since IDPA presently has no such policy in force and plaintiffs' second ground for relief is meritorious. Plaintiffs contend that IDPA's policy regarding medical bills which have been paid for voluntarily by a third party violates IDPA's obligation to deduct incurred medical expenses from income unless subject to payment by an "individual, entity or program that is or may be liable" for them. 42 C.F.R. §§ 435.732(c)(i); 433.136(3). As explained below, the court agrees.
In Gadway v. Blum, 567 F.Supp. 772 (N.D.N.Y.1983), the New York Department of Social Services had attempted to treat bills incurred by Medicaid recipients and subsequently written off by hospitals under the Hill-Burton Act, 42 U.S.C. §§ 291 et seq., in a similar manner. In defense of its policy, the state argued that "expenses which are initially encountered but later forgiven cannot be considered incurred expenses" and that such bills were nonetheless not creditable against spend-down for having been "subject to payment by a third party." Id. at 775. The court rejected both propositions, noting, among other things, that the Hill-Burton program was not a third-party payor within the meaning of the Act. Id.
Because Gadway was ultimately decided on statutory grounds peculiar to the Hill-Burton program, its reasoning is not conclusive with respect to the present case. Like the Hill-Burton program, however, an unobligated party who voluntarily pays a Medicaid recipient's incurred bill is not a third party within the meaning of 42 C.F.R. § 433.136. That provision applies only to third parties legally obligated to pay. Hence, IDPA's treatment of such bills violates the regulatory directive of 42 C.F.R. § 435.732 to deduct all incurred medical expenses against income unless subject to third-party payment, and also the statutory directive that state Medicaid plans shall "tak[e] into account, except to the extent prescribed by the Secretary, the costs ... incurred for medical care...." 42 U.S.C. § 1396a(a)(17)(D) (emphasis added). By refusing to take into account incurred medical expenses which the Secretary has not exempted from consideration, IDPA's plan runs afoul of Title XIX. Where voluntary third-party payments have been shown to be gifts and not loans, the Medicaid statute apparently allows them to be treated as income to the recipient. IDPA has no discretion, however, to exempt all bills on which such payments are made from the spend-down calculation.

3. Whether IDPA must require medical providers to make refunds to persons who pay medical bills in excess of their spend-down.

Plaintiffs' final claim is brought on behalf of all Medicaid recipients who have actually paid for their medical bills in the three-month period prior to filing for IDPA assistance. Under 42 U.S.C. § 1396a(a)(34), the IDPA must make "available" medical assistance for a three-month period prior to application as well as prospectively. As implemented by 42 C.F.R. § 435.914(a), this provision requires state Medicaid agencies to "make eligibility for Medicaid effective no later than the third month before the month of application" for individuals who received Medicaid services during the three-month retroactive period and would have been eligible for medical assistance had they applied earlier.
Where the individuals eligible for retroactive assistance under these provisions remain *1331 liable for their debts, IDPA policy is to pay that portion of the bills which exceeds the applicant's spend-down. Where individuals have paid their bills, however, the IDPA considers itself responsible only if the vendor voluntarily refunds the recipient's earlier payment and bills the IDPA for the services rendered. However, because the private pay rate for medical providers is higher than the Medicaid rate, providers generally do not volunteer to make such refunds. (Plaintiffs' Exhibit 7, ¶ 10; Defendants' Memorandum at 7). Because IDPA lacks authority to issue payments to the Medicaid applicants directly, see 42 U.S.C. § 1396a(a)(32), Medicaid applicants who have reduced their assets and income below protected levels during the retroactive period are denied any meaningful method to recover those payments.
Plaintiffs argue that, by not requiring participating doctors to refund amounts already paid and then reimbursing those vendors under the Medicaid fee schedules, IDPA is violating both its duty to make Medicaid "available" for the three months prior to application, 42 U.S.C. § 1396a(a)(34), and its duty to "limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency...." 42 C.F.R. § 447.15. In response, IDPA simply argues that neither HHS nor the statute expressly requires it to employ such procedures. IDPA therefore leaves the applicant who has paid bills during the retroactive period to seek reimbursement on his own, despite the apparent difficulty of convincing medical providers to refund prior payments in exchange for a lesser amount.
The position of HHS on this issue is unclear. The Medical Assistance Manual, § 3-10.900, Question 10 (Defendants' Exhibit A) expressly supports the IDPA's position:
State payment for retroactive services is required only where persons have not paid for the medical care and services received in the three months prior to the month of application. If the vendor is willing to refund the payment to the recipient and bill the State for the service, the State would then be expected to make payment provided the service was necessary and the person was eligible for coverage when the service was rendered.
In 1979, however, the Regional HEW Office, responding to a petition filed by the Illinois Welfare Rights Organization (IWRO), reached the opposite conclusion:
Medicaid providers must accept payment from the State as payment in full. We believe that this requirement, together with the requirement that the State provide three-month retroactive coverage, impose upon the State an obligation to notify and require vendors who regularly participate in the Medicaid program to refund amounts already paid by recipients for services received during the retroactivity period and then pay those vendors under the Medicaid fee schedules.
(Plaintiff's Exhibit 25). Three months after this ruling, however, the Regional Office notified the parties that the Central Office had advised that this interpretation might conflict with current federal policy, and that its earlier recommendation should therefore be held in abeyance pending further review. (Plaintiff's Exhibit 26). Since that time, HHS has taken no position on the matter.
Given HHS's conflicting signals, the court finds the question an open one, and concludes that IDPA's refund policy, although not expressly prohibited by regulation, falls short of its duty to make Medicaid "available" and "effective" no later than three months prior to the date of application. Implicit in such a requirement is that Medicaid applicants be eligible for assistance throughout that period on the same terms under which they are eligible after application. Significantly, IDPA does not argue that it can legally limit medical assistance after application to people who do not pay their bills; indeed, IDPA policy regarding bills for services provided within the regular established period requires crediting against spend-down regardless of payment. AABD & AFDC Manuals, PO-620.2. Nor does IDPA argue that its duty *1332 to limit participation to providers who accept the Medicaid fee schedule amounts as payment in full does not apply to the retroactive period. Yet, IDPA argues that it may ignore discrepancies in result between the retroactive period and the prospective period because the statute nowhere requires it to compel refunds.
This court cannot acquiesce in so niggardly a view of IDPA's responsibilities under Title XIX. The purpose of the three-month retroactive period is to "protect[] persons who are eligible for Medicaid but do not apply for assistance until after they have received care, either because they did not know about the Medicaid eligibility requirements, or because the sudden nature of their illness prevented their applying." H.Rep. No. 92-231, 92d Cong., 2d Sess., reprinted in [1972] U.S.Code Cong. & Ad. News 4989, 5099; see also S.Rep. No. 1230, 92d Cong., 2d Sess. 209 [1972] (same). Rather than protect these people, however, IDPA's policies preclude retroactive coverage for all those people who either depleted their savings below protected levels or borrowed from others to obtain medical care. By leaving indigent Medicaid recipients to the financial largesse of their medical providers, IDPA is simply failing to ensure that Medicaid providers accept the fee levels they undoubtedly would be required to accept were the services provided after a favorable eligibility determination. Under these circumstances, the court has equitable power to enforce the terms of the statute despite HHS's failure to act. See Califano v. Yamasaki, 442 U.S. 682, 705 & n. 17, 99 S.Ct. 2545, 2559 & n. 17, 61 L.Ed.2d 176 (1979). Accordingly, where vendors who regularly participate in the Medicaid program have extended medical services and received full payment from eligible applicants in the retroactive period, the IDPA must compel those providers to refund the amounts paid and accept payment by the state as a condition of further participation.

Conclusion
The plaintiffs' motion for summary judgment is granted. The case is set for status on January 15, 1985, to discuss the execution and implementation of a final order for relief.
It is so ordered.
NOTES
[1] Because of identical relief granted in Brogan v. Miller, 81 C 6539 (N.D.Ill.), the class originally certified by this court was amended to exclude members of the Brogan class: all medically needy aged, blind, or disabled IDPA applicants on or after Sept. 1, 1981 who do not reside in long-term care facilities.
[2] Medical Assistance-No Grant (MA-NG) is the term by which the IDPA refers to all individuals who qualify for Medicaid by spending down their income to the 1972 eligibility levels rather than by participating in one of the categorical welfare assistance programs.
[3] All CFR references have been updated to the Oct. 1, 1983 compilation (published last April).
[4] Just before this opinion was issued, plaintiffs' counsel informed the court that HHS has reiterated its view that the IDPA may not exclude medical bills for which applicants are currently liable from spend-down simply because they were incurred more than six months prior to the established period. (Letter dated July 27, 1984 from Carolyne Davis, Health Care Financing Administration to Gregory Coler, IDPA Director.) The IDPA asked HHS to reconsider its decision, and a hearing was set for November 6, 1984, 49 Fed.Reg. 38193 (Sept. 27, 1984). The hearing was apparently canceled, and has not been reset. HHS's recent action therefore supports the conclusion reached by the court.